,jjEEj
iphe questions for the determination of the court in this cause, relate to the construction and legal effect of the second -clause of the will of John Redd deceased. The will bears date on the 21st of February 1843; and the clause in question is in the following words:
“ Second. I give and devise to my daughter Lucy D. Wootton, all that part of my Marrowbone lands whereon I now live, in the county of Henry, beginning on my spring branch at the bridge; running up the ditch of said branch to the head of said branch; thence with the line heretofore deeded to John T. Wootton and' Lucy D. Wootton, to the Order line, to her the said Lucy D. Wootton and her heirs forever.”
At the date of the will the testator owned about fifteen hundred acres of land situate on both sides of the creek named, of which between eight and nine hundred acres lay bn the west, side of the creek, and between six: and seven hundred on the east side. The testator resided on the west side ; and it appears that the land on the eastern side was tended and cultivated separately from that on the western side, with a different overseer and a distinct set of hands Hear the mansion-house of the testator was a spring from which flowed the branch referred to in the will as the “ spring branch,” emptying into Marrowbone creek; Running across that portion of the land' lying on the west side of the creek in a direction nearly parallel to that of the creek, was a road designated the “ Marrowbone road,” which divided the land on that side into two parts, one of which, that bordering 'on the creek, was about a third of. the whole on that side. This road crossed the spring branch upon a bridge at a point which would appear to be some eighty or *203 ninety poles from its mouth, and this “Pole bridge,” as it is called, is designated in the will as the place of beginning of the land devised to Mrs. Wootton. Some years previously to the making of this will, the testator had owned somewhere in the neighborhood of five hundred acres more of land on the west side of the creek, and constituting a part of his then mansion-house tract; being the upper portion upon the creek. By a will made in 1836 he had given to his daughter Mrs. Wootton, (wife of John T. Wootton,) a considerable portion of this land on the west side of the creek, being the upper portion thereof commencing on the creek at the upper corner at or near the ford of the creek which is designated as that near Dr. George Hairston’s; thence running down the creek to the ford used in passing from the testator’s house to his plantation on the eastern side of the creek called Dillon’s; thence leaving the creek by several courses bearing in a northwesterly direction to the back line ; and thence with the exterior lines to the beginning; containing between nine hundred and a thousand acres of land, and embracing the mansion-house, the spring, and the appurtenances. Subsequently, by deed dated on the 21st of April 1S38, the testator conveyed to John T. Wootton and wife part of the land which he had thus given to Mrs. Wootton by the will of 1836, of which pare, supposed to be about five hundred acres, it is recited in the deed that he had already placed John T. Wootton in possession. The land thus conveyed to Wootton and wife is described as beginning at the mouth of the spring branch on Marrowbone creek; thence up the branch to the bridge on the public road; thence along the road a few rods to where the cross fence joins the lane fence that divides the part conveyed from the balance of the tract; thence along the said fence to a lot designated; thence a direct line to the line known as “Harmer’s, &c. Order line;” thence *204 with the exterior lines of the tract to Marrowbone creek; and thence down the creek to the place of beginning. The fence referred to in this deed as the division line, begins at the line fence a few rods from the Pole bridge across the spring branch before referred to, and runs up the branch to a point at which it crosses its modern channel at a distance of about one hundred yards below the- spring. Between this fence and the branch below the point of intersection, and bounded on the southeast by the lane fence, there is embraced a small piece of land ascertained to be about nine acres.
The appellant contends that under the terms of the will the whole of the lands owned by the testator lying on the west side of Marrowbone creek, was devised to her, (excepting a small piece of about eighteen acres devised to the testator’s son Edmund B. Redd,) the quantity being about eight hundred and fifty acres by one survey, and about eight hundred and sixty-fivé by another. The appellees insist that what is described by those terms is the strip above mentioned of nine acres, and that this strip only passes by the devise. Or if it do not satisfy the terms of the description, then that the subject is so vaguely and imperfectly described that the devise is void for uncertainty.
That the clause in question is involved in some doubt and obscurity, will be apparent when it is considered that the testator has used a form of expression which may import the whole of the tract on which he resided, lying west of Marrowbone creek, or a part of that tract only, according to the force and effect of the particulars of description or boundary which he has superadded; and when it is ascertained that the supposed boundaries of themselves embrace nothing; that they constitute no diagram; that in effect they form but one irregular line the termini of which, the Pole bridge at one extremity and the intersection with the *205 “ Order line” at the other, are nearly one mile apart. But however great may be the doubt and obscurity which rest upon the subject, and however difficult may be the task of eviscerating the intention of the testator, still if it can be ascertained by any legitimate means, it must be held sacred, and full effect must be given to it.
In performing the duty of expounding a will, the court will make the amplest allowance for the unskillfulness and negligence of the testator, technical in-formalities will be disregarded, the most perplexing complications of words and sentences will be carefully unfolded, and the traces of the testator’s intention will be diligently sought out in every part of the instrument, and the whole carefully weighed together.
Nor in the performance of this duty will the judicial expositor be confined to its mere contents. For an investigation into the state of facts under which the will was made will often materially aid in elucidating the scheme which the testator had in mind for the disposition of his estate. Hence he will endeavor to place himself in the situation of the person whose language he is called on to interpret; and as this can only be done by the aid of extrinsic evidence, such evidence may be resorted to for the purpose of showing the situation of the testator and the state of his family and of his property at the time of making his will. And, generally, evidence may be received as to any facts known to the testator which may reasonably be supposed to have influenced him in the disposition of his property, and as to all the surrounding circumstances at the time of making the will. Wigram on Admission of Extrinsic Evidence in Aid of the Interpretation of Wills, p. 11, et seq. Proposition 5, p. 51. Ibid. p. 57 ; Smith v. Bell, 6 Peters’ R. 68, 75 ; Doe v. Martin, 1 Nev. & Mann. 524; Shelton v. Shelton, 1 Wash. 53, 56; Kennon v. McRoberts, Ibid. 96, 102; *206 Ellis v. Merrimack Bridge, 2 Pick. R. 243; Brainerd v. Coudry, 16 Conn. R. 1. But if after exploring throughout the entire contents of the instrument, aided by a knowledge of all the facts known to the testator and of all the circumstances surrounding him at the time of making it, the judicial expositor is unable to penetrate through the obscurity in which the testator has involved his intention as to a material fact, the failure of the intended testamentary disposition is the inevitable consequence. Conjecture cannot be permitted to usurp the place of judicial conclusion, nor to supply what the testator has failed sufficiently to indicate. The.law has provided a definite successor to the estate in the absence of a testamentary disposition, and the heir is not to be disinherited unless by express words or necessary implication. 1 Jarman on Wills 315; Wigram on Ex. Ev. Prop. 6, p. 11; 1 Greenleaf’s Ev. § 2S7, n 1.
The parties in this case have taken much testimony as to the situation of the testator and his family and property, and of other facts and circumstances surrounding him at the time of making his will, with a view to elucidate his intention and the scheme which he had framed for the disposition of his property. That all the evidence of this character may properly and legitimately be considered in passing upon the construction of the will, cannot be doúbted. But there is another kind of testimony also offered, which comes in a more questionable shape, and to which exception has been taken. With a view to show that it was the intention of the testator in the second clause of his will to give to her all of the land which he' owned on the west side of Marrowbone creek, (excepting the small piece devised to Edmund Eedd,) the appellant has taken the depositions of various witnesses to prove declarations made by the testator, that he had given that part of his lands to her by his will, *207 or that it would be hers at his death, or that he intended to give it to her at his death, or other statements of the like import. The proofs of this character are, however, far from being satisfactory. Some of the witnesses by whom they are made are effectually discredited. Others appear to differ as to what the testator stated he intended for Mrs. Wootton. For example, the witness Patterson states that he understood the testator to say she would get the land down to the mouth of Crouch’s branch; thence up the branch and crossing the road to the “ Order line and that the place called “ Crouch’s field’’was to be sold along with the land on the creek called “ Wash’s’place” or l^aA.%uarter.”'“^Mid yet Crouch’s field constituted a^on^We^^^^Aion of the mansion-house tract on thgM^sv si3e"of the «reek, which is now claimed by thj| the testimony of this character w emsu ffi ci en a r and explicit, I should think it not entffieff'Wany consideration. It is well settled that such evidence is inadmissible to make out a testamentary gift. A party seeking to maintain a devise, must show it by a will in writing; and it would be wholly inconsistent with this rule, where a testator has failed to make a perfect and explicit disclosure of his scheme of disposition in his will, to permit its deficiencies to be supplied by parol proofs of declarations of the testator, or other similar evidence of actual intention. The enquiry is not what the testator meant to express, but what the words which he has used do express; and to such an enquiry evidence of instructions given by the testator for his will, or of his declarations as to what were his intentions in the disposition which he had made, or as to the disposition which he intended to make of his property, is obviously inapplicable; and the authorities against its admissibility are numerous and decisive. Wigram, Prop. 6, p. 83, S9, 97 ; Bennet v. Davis, 2 P. *208 Wms. 316; Strode v. Lady Falkland, 3 Chy. R. 98; Brown v. Selwin, Cas. Temp. Talbott 240; Lord Walpole v. Earl of Cholmondeley, 7 T. R. 138; Newburgh v. Newburgh, 5 Madd. R. 364; Goodringe v. Goodringe, 1 Ves. sen. 231; Murray v. Jones, 2 Ves. & Beame 313 ; Preedy v. Hottom, 4 Adolp. & Ell. 76; Hiscocks v. Hiscocks, 5 Mees. & Welsb. 363 ; Miller v. Travers, 8 Bing. R. 244; Jackson v. Sill, 11 John. R. 201. The only exceptions to the rule are certain special cases in which it is found that the terms used apply indifferently and without ambiguity to each of several different subjects or persons. In such cases evidence will be received to prove which of the subjects or persons so described was intended by the testator. Wigram, Prop. 7, p. 101; p. 183, pi. 215.
Laying aside then all these declarations of the testator, and other similar evidence of actual intention, as contradistinguished from the surrounding circumstances, we must endeavor, with the aid of the latter, to place ourselves in his situation, and thus interpret the language he has used. We must declare, if we can, what intention he has expressed with sufficient legal certainty, not the intention which he may have entertained, but which he has failed sufficiently to manifest. Guy v. Sharp, 1 Myl. & Keen 589, 602; Martin v. Drinkwater, 2 Beav. R. 215.
■ In the construction of wills it is a well settled rule that effect must be given to every word of the will, if any sensible meaning can be assigned to it not inconsistent with the general intention on the whole will taken together. Words are not to be changed or rejected unless they manifestly conflict with the plain intention of the testator, or unless they are absurd, unintelligible or unmeaning, for want of any subject to which they can be applied. Gray v. Minnethorpe, 3 Ves. jr. R. 103 ; Constantine v. Constantine, 6 Ves. R. 100; Doe ex dem. Baldwin v. Rawding, 2 Barn. & Ald. *209 441, 451; Chambers v. Brailsford, 2 Meriv. R. 25 ; Doe v. Lyford, 4 Man. & Sel. 550. And though it may be possible the testator intended to give more, yet if there be a subject found to satisfy the description, the court can neither enlarge nor extend it. Doe ex dem. Chichester v. Oxenden, 3 Taunt. R. 147 ; Doe ex dem. Oxenden v. Chichester, 4 Dow. Parl. R. 65; Jackson v. Sill, 11 John. R. 201.
But where the subject is sufficiently and clearly ascertained, though there be added particulars of description which are found to be false or mistaken, effect will be given to the devise notwithstanding; and these false or mistaken particulars of description will be rejected. Here the maxim “ falsa demonstratio non nocet cum de corpore constat” properly applies. Thus, where a testator devised “ all that his farm called Brogue's farm, in the parish of Darley, now in the occupation of A. Clay;" but two certain closes which were part of 'Brogue's farm were not in the occupation of the person named. Yet it was held that the devise embraced the whole of Brogue's farm, and was not affected by the mistaken terms of description superadded; which might accordingly be rejected. Goodtitle v. Southern, 1 Mau. & Sel. 299. So where a testator devised to his wife his farm at Bonington, in the tenure of John Smith, &fc. a portion of the farm was excepted out of the lease to Smith, but it was held that the words “ in the tenure of John Smith," were but additional terms of description of a subject already sufficiently designated, and being mistaken, might be rejected. So that the whole of the farm was held to have passed by the devise. Goodtitle v. Paul, 2 Burr. R. 1089. So where there was a devise of all of a farm and lands called Colt's Foot farm now on lease to Mary Fields at the yearly rent of one hundred and fifty pounds, a close of seven acres, part of Colt's Foot farm, but excepted out of Mary Fields’ lease, was held to *210 have passed. Down v. Down, 7 Taunt. R. 343. So where a testatrix devised all her Briton Ferry estate, was afterwards described as “ situate, lying and ^e]ng jn -¡¡hg county of Glamorgan in the principality 0f leales.” A part of the Briton Ferry estate was in fact situate in the county of Brecon; yet held that the whole passed. Doe v. Earl of Jersey, 1 Barn. & Ald. 550.
A similar decision was made in a case in Maryland, in which a testator devised a tract of land by name, but which he went on to describe'as lying in a particular county. This was deemed but a mistaken description, and it was held that the whole tract passed - though part lay in another county. Hammond v. Ridgly, 5 Harr. & John. 245. See also Hustead v. Searle, 1 Ld. Raym. 728; Wrotesley v. Adams, Plowd. 187, 191; Goodright v. Pears, 11 East. 57.
The doctrine of these and, similar cases the counsel for the appellant seek to invoke into this case. 'They maintain that as the particulars of description in the nature of boundaries contained in the devise to her constitute together but one irregular line, the termini of which are nearly one mile apart, describe nothing, embrace nothing, they must be disregarded. It is argued with great force that if such particulars giving a false or mistaken description of the subject, would not defeat the devise, still less should they do so, if they give no description, if they amount to nothing more than an abortive and ineffectual effort to describe something which it is impossible for them to describe. It is therefore insisted that these particulars of boundary should-be wholly rejected as unmeaning and insensible, and that the subject of the devise should be ascertained from the previous description, which they allege is sufficient to identify it as the “ home place” of the testator, or the whole of his Marrowbone lands lying on the west side of the creek.
*211 But in order to bring this case within the influence of the principle asserted in the cases above cited, and the other cases to be found to the same effect, and to reject the particulars of boundary found in the devise, it must appear that the other words of the clause give a clear, certain and unambiguous description of the subject devised; and that the particulars given are but words of suggestion and affirmation superadded as further descriptive of a subject already and efficiently indicated. If on the other hand, such particulars are restrictive in their character, if they serve to narrow and limit the extent of the subject pointed out by the previous words, they never can be rejected. And if there be a subject found which satisfies the whole description taken together, evidence cannot be received to show that the testator intended a greater or different subject. If this were permitted, it would be in effect to make a will for a testator by parol when the law requires that it shall be evidenced by writing. And it would be dangerous to permit words of restriction used in a will intended to narrow or curtail the dimensions of the subject pointed out, to be rejected, and allow the party to claim under the general terms of the devise discharged of the restriction. The effect might be to impute to a testator a meaning which he never intended, and to make him thus give the whole when it was his wish and intention to give part only. Thus for example, in this case, if the testator’s mansion-house tract, instead of lying wholly within the county of Henry, had lain partly in that county and partly in Pittsylvania, and he had omitted the name of the county in this clause of his will, so that it read “ I give to my daughter Lucy D. Wootton all that part of my Marrowbone lands whereon I now live in the county of .” Here would be an imperfect, incomplete description, creating an ambiguity patent on the face of the will. Nor could the blank be filled by *212 evidence. Hunt v. Hort, 3 Bro. C. C. 311; Miller v. Travers, 8 Bing. R. 244; Wigram, p. 88, pl. 121. The superadded words, however, could not be regarded as merely words of description of a subject already sufficiently described. They would plainly appear to have been intended to be words of restriction, and to reject them would be to give the whole of the lands in both counties, when it was the testator’s intention to give the part lying in one only. Numerous cases in which words of description found in a devise were yet held to be restrictive, and therefore such as were not to be disregarded are to be found in the reported decisions. Thus in Woodden v. Osbourn, Cro. Eliz. 674, the words “in Cokefield” were held to be restrictive, and to limit the devise of all the testator’s Hayes land to such as he had in Cokefield, though it appeared that he had other lands called Hayes lands in Cranfield. In Parkin v. Parkin, 5 Taunt. R. 321, the devise was of all the lands, tenements, &c. of the testator in the township of Thurgoland, “then in his own occupation.” At the time of making his will the testator was seized of a messuage and five acres of land in the township of Thurgoland, which were then in his own occupation. He was also seized of an inn and nine acres of land in the same township, but which were not at that timé occupied by him. Held, that the words of occupation we2-e clearly restrictive, and 'that the inn and nine acres did not pass by the devise. So where a testator reciting that he was seized of divers freehold lands in Islington, and certain copyholds, “ and all which lands, Sfc. were subject to a mortgage thereof made by him,” (which he described,) gave and devised all his said freehold and copyhold lands and hereditaments. At the date of the will the testator owned twenty-one acres of freehold lands in Islington, which were not embraced by the 2nortgage mentioned in-the will; and it was held that the words referring to the *213 mortgage were to be regarded as restrictive, so that the twenty-one acres did not pass by the devise. Pullin v. Pullin, 3 Bing. R. 47. In Jackson v. Sill, the words “ which I now occupy,” annexed to a devise of lands, were held to be restrictive, and not such terms of additional description as could be rejected ; and it was accordingly held that a tract of land of ninety acres, which the testator had leased to another person before making his will, did not pass by the devise. So in another case, the words “ on which I now live,” annexed to a devise of lands, received a similar construction, and were held to exclude a lot of sixteen acres not adjoining and which had been on lease to others. Jackson v. Moyer, 13 John. R. 531. Other cases are to be found in which under different forms the same principle is asserted and enforced.
We come then to the question whether the words of local description in the nature of boundaries found in the devise in this case are terms of additional description merely superadded where the subject of the devise had been already clearly and unmistakably indicated, as the whole of the lands on the west side of Marrowbone creek? Or were those words intended to be restrictive in their character, so as to limit the devise to a portion of those lands, and if so, to what portion ? And here the enquiry at once suggests itself, why should the testator, if he had intended to give the whole of the lands on the west side of the creek, have added any boundaries at all ? The obvious and plainest mode of making such a devise would have been to give all the lands on the west side of the creek, or in the form adopted by the testator, to stop at the end of the words “ whereon I now live,” and the addition of boundaries was wholly unnecessary. But this he has not done. He has adopted a form of expression, “ all that part of my Marrowbone lands,” which, whilst it might import all the lands on the west side *214 of the creek if it had stopped with the words “ whereon I now live,” may and must import a part of those lands only, if the words of description superadded operate to restrict it to a part. And we are not without a history of the particular form of expression used. The words of the devise were copied from the will of 1836 down to the word “ beginning,” inclusive, and then different boundaries were inserted in place of those found in that will. By the will of 1836 the testator did not give the whole of the mansion-house tract or the lands lying on the west side of the creek to the appellant, but gave a part only : for the boundaries given excluded all that portion lying north of Crouch’s branch and of a line running from the public road where it crossed the branch to the “ Order line,” being about four hundred and five acres. So that we see the boundaries which followed the same form of expression in the will of 1836 were intended to restrict the general description to that portion of the land on the west side of the creek lying south of Crouch’s branch and the line above specified. It is true those boundaries are replaced by different boundaries in the will of 1843; but when the testator used the same form of expression in the latter though giving different boundaries, it may not be unreasonable to infer that he intended the boundáries to perform a similar office to that for which they had served in the will of 1836, and restrict the devise to a part of the mansion-house tract. It will be seen too that when the testator speaks of the whole of a tract, he says “ a tract,” and gives a general designation of the land intended, without attempting to give the exterior boundaries. Where, however, he speaks of part of a tract, he uses the expression “that part,” and then goes on to describe the part intended by boundaries or some specific local demarcation. This would seem to have been his mode of thought upon the subject, and it may almost be re *215 garded as a law of the will. It tends to show that when the testator uses the expression “ a part of his lands,” he has in mind a part to be circumscribed by metes and bounds, not the whole of a tract to be designated by general terms of description.
Again. If the testator intended to give the whole of the lands on the west side of the creek, why not commence the boundaries at some point on the creek, or at the terminus of some one of the exterior lines ? Why commence in the middle of a line at a point some eighty or ninety poles from the creek ? If on the other hand, he intended to give only the nine acres lying between the line of his deed to Wootton and wife and the spring branch, then he commenced his description at the point at which he naturally would and ought to commence it. For it is at that point that the line of the deed deflects from the course of the spring branch and runs along the lane to the cross fence, and thence with that fence as stated in the deed, so as to form a diagram with the spring branch, embracing the nine acres, the apex of which is at the point designated as that of the beginning.
It is to be observed too that in the fifth clause of his will the testator gives to his son Edmund Kedd a part of his land lying on the west side of the creek, which he describes by specific boundaries. This, though perfectly consistent with the devise to Mrs. Wootton, if it be restricted to the nine acres, is yet irreconcilable with it if it is to be regarded as a devise of all the lands on the west side of the creek. It is true that irreconcilable devises may occur in a will, so that all cannot stand together, and that in such a case,' where the repugnancy plainly appears, the prior devise must yield to that which is posterior in local position so far as may be absolutely necessary to give effect to the latter, but no further. But where the enquiry is as to what is embraced in the prior devise, *216 a subsequent devise may be properly looked to as tending to show the true subject of the former devise ; for it will not be supposed that the testator intended to give by the posterior devise what he had already given by the former. It is said, however, that the land devised to Edmund Redd was not a part of the Marrowbone lands. But it is nowhere shown to be a separate and distinct tract. The proofs are, I think, rather the other way. Perkins says expressly that he believed it was a part of the Marrowbone tract on which the testator lived ; and Patterson, Dillon and Dupuy seem to regard all the testator’s lands on the west side of the creek as part of his home place or Marrowbone lands. It is so laid down on the plat of Wingfield; on that of Graves it is not so represented. The argument indeed is that by the terms “ Marrow-bone lands,” all the testator’s lands on both sides of the creek were included; and that by the words “all that part of my Marrowbone lands whereon I now live,” was meant that portion of them lying on the west side of the creek, and not a part of the latter.
With regard to the meaning thus assigned to the terms “Marrowbone lands,” I will here remark that whilst such a form of expression is frequently, perhaps most usually employed to denote the lands on both sides of the water course named, yet it is not of necessity used in that sense only. From the- situation of lands on one side relatively to a water course and to some other stream uniting with the former upon which they may chance also to lie, or from some other local circumstance or because they had acquired some other notorious name and designation, it might very well happen that the lands on the other side only would take the name of the particular water course. And the question is, in what sense did the testator use the terms? What lands did he intend to designate by the words “ Marrowbone lands ?” The proofs tend rather *217 to show that it was his habit to apply those terms to the mansion-house tract, the lands on the west side of the creek, whilst he spoke of the lands on the opposite as “ Wash's flaca or the quarter," and sometimes as “ Ellis'."
But is is said there was no inducement to give Mrs. Wootton the nine acres; that it was of little value to any one, and of no peculiar value to her; and that in point of fact when he made his will, the testato'r regarded it as already hers, because he believed the spring branch was the line between his land and that conveyed to Wootton and wife. I do not think it satisfactorily proven that such was the testator’s impression. It is true some of the witnesses testify to their having heard him speak of the spring branch as the line, or say that the lands south of the spring branch belonged to Wootton and wife. Others say that he recognized the fence as the line; and it is proved that he had a part of the strip between the fence and the branch in cultivation. It may be that in speaking of the branch as the line or of the land south of the branch as the land of Wootton and wife, he intended only to give a general idea of the course of the division line, without designing to state with precision the exact line named in the deed which he knew run so near the branch.
In the original bill filed by the appellant there is no suggestion of any such belief or impression having been entertained by the testator ; and whilst it is admitted that the fence was the line, it is not intimated that any other had been recognized by him. The line is described minutely and unmistakably in the deed. It leaves the branch at the Pole bridge and runs along the road a few rods to the junction of the cross fence with the line fence; thence with the former to the horse lot, &c. And from the manner of expression used in the deed, and the similarity of style and in *218 the mode of spelling a particular word, one might infer that it was written by the same person who wrote the twro codicils purporting to have be n written by the testator himself. But however this may be, he was doubtless familiar with the contents, and knowing the ground perfectly, he may have had some reason when he made the deed for deviating from the spring branch and adopting the fence as the division line instead. He is represented by all the witnesses who speak of his mental character and capacity, as being a man of vigorous intellect, and remarkable for caution in the transaction of business. It is difficult to suppose that such a man would in a few years have forgotten or become confused about a division line which he had carefully established between his own land and that of a neighbor; while upon the other hand, if he had changed his purpose of giving a large part of his home place to Mrs. Wootton as he certainly had in regard to his son Edmund Redd, it might have occurred to him that it would be proper (not knowing, into whose hands the homestead might fall) to secure to Mrs. Wootton the strip between the spring branch and the fence as he seems to have thought it proper to secure to Edmund Redd the small piece of eighteen acres on the opposite side of the tract, north of the still-house branch. He may have thought (as many of the witnesses examined seem to think) that it would be important to Mrs. Wootton to have free access to the branch for water for her hands and stock, of which the supply would seem to have been otherwise scanty on that side of her land: and he knew that to run with the branch would straighten the line, save fencing and improve the form of -both properties, while it would substitute a permanent natural boundary for one easily changed and in its nature perishable. That the will devises to Mrs. Wootton while the deed is to Wootton and wife, offers no difficulty. Husband and *219 wife are treated as one both in common parlance and in law for most practical purposes, and from the character of the provisions of his will the testator appears not to have discriminated between them.
I think there is not much force in the argument that such terms as “ all that part of my Marrowbone lands” could not have been intended to describe a small piece of land of nine acres. “All that part” is but a formal mode of legal expression, importing the entirety of the thing devised, whatever it may be, and not that it is either great or small. They were evidently used as words of form, copied from the will of 1836, which the testator had adopted as bis guide as to the formal parts of the instrument, whilst the substantial parts were supplied by written memoranda or dictated orally by him at the time. Nor is there any thing in the local position of the devise to Mrs. Wootton, being the second clause of the will, to raise a presumption that the testator intended to give her a large or substantial part of his lands, for we see that the bequest that precedes it, constituting the first clause of the will, is a nominal one of one dollar to his grand daughter Mrs. Preston.
Some stress has been placed on the fact that the wife of the testator and some of his children were buried on the home tract; and it is urged that it is not likely the testator would have directed that tract to be sold, and thus rendered it liable to pass into the hands of strangers. Upon subjects of this character men differ in their feelings and sentiments. In this country, where the character of our institutions combines with the spirit of the age to encourage the ready disposal of property of all kinds, which is accordingly constantly changing hands, this sentiment of attachment and veneration for a particular spot, where rest the remains of the deceased, is liable to be weakened and impaired. We have no clue to what may have *220 been the particular sentiments of the testator on this point, though we see that he directs all his negroes to be sold, among whom, it is said, were old and valuable family servants. It may be that the value of the improvements on the home place was such as to render it difficult to divide it in a manner that he approved, and he may have thought that some member of his family would buy it in at the sale. At best, it is a mere circumstance, and one of little weight or significance.
But little light is thrown upon this subject by a comparison of the amounts that will have been received by the different children in the form of advancements, and of their respective shares under the will. In Choat v. Yeats, 1 Jac. & Walk. 104, Sir Thomas Plumer (master of the rolls) remarked, “It is always the safest mode of construction to adhere to the words of the instrument, without considering either circumstances arising aliunde or calculations that’ may be made as to the amount of the property and of the consequences Sowing from any particular interpretation.” This remark is cited with approbation by the vice chancellor in Parker v. Marchant, 1 Younge & Col. 290, 310. But from the best estimate which I have been enabled to make from the materials in the record, I think Mrs. Wootton will have received considerably more than either one of several of the children, and it may not be very remarkable that she may get less than some of the others. The evidence does not, I think, establish any thing like a marked partiality or favoritism on the part of the testator towards any of his children. There are some rather vague expressions of opinion by witnesses that Mrs. Wootton was a favorite, and some declarations proved of Edmund Redd to that effect. The reasons assigned for such opinion are not very satisfactory, and the general effect of the evidence is rather to prove that the testa *221 tor cherished feelings of kindness and parental affection towards all of his children. And it would seem to be unexplained why the testator should have given to Mrs. Wootton the further sum of one thousand dol-¡ lars by a codicil if he had in fact given to her the whole of the home place : whilst on the supposition" that he had given her the nine acres only, a ready reason is suggested for his giving her that additional legacy.
The objection which has been urged to construing the devise to be of the nine acres, that the testator is thereby made to give to Mrs. Wootton a piece of land already belonging to her on the south side of the fence where the branch passes on that side near the spring, is I think sufficiently explained by the testimony. It is shown that the true original channel of the branch was upon the north side of the fence throughout, but that in consequence of a large deposit made on a lot of the testator on the branch, its course had been changed at that point and -made to pass on the south side of the fence; and that if such deposit were removed, the branch would resume its original channel. And when the testator spoke of the branch, it may be presumed he referred to its proper original course and not to the new or artificial channel occasioned by the obstruction. There may be more difficulty in explaining why the testator should have called to run from the head of the branch “ with the line heretofore deeded to John T. Wootton and the said Lucy D. Wootton to the Order line,” when no part of the line mentioned in that deed as running to the “ Order line,” beyond the point of intersection with the line from the head of the spring, is any part of the boundary of the nine acres. But it will be remembered that the fence called for in the deed does not touch the spring, but passes it at a distance variously estimated at eight yards or from eight to twelve steps. The proper call *222 therefore for the next course, after attaining the head of the spring, would not be to run with a line so far distant from it, but to run to that line. Hence if we may suppose that from some confusion or misapprehension at the moment either on the part of the testator or of the scrivener, the word “ with” was inserted instead of the word “ to,” which wmuld seem to be the proper word indicated, the whole difficulty will be removed, and the call thus explained will be in effect to run from the head of the spring to the line in the deed to John T. Wootton and Lucy D. Wootton, which runs to the “ Order line.” So that this line would not be made, as it could not be (beyond the point of intersection) any part of the boundary of the nine acres, but would be simply referred to as that ini' which the terminus of the line running from the head of the spring was to be found. Or it may be that the testator having in mind the land which he had conveyed to Mr. and Mrs. Wootton and the line named in the deed which divided it from the land retained by him, and desiring to substitute the branch to its head as the division line in place of the fence, therefore calls to begin at the Pole bridge, (the apex of the figure embracing the nine acres and the point at which the line of the deed leaves the branch,) and thence continues the line of division beginning at the mouth of the branch (on the creek) by running up to its source, and then finishes the entire division line by calling to run with the line of the deed to the “ Order line.” From its mouth to the Pole bridge, the branch was the division line according to the deed: by his will he continues the branch as the division line to its source, and then completes it by running from the spring with the old division line of the deed to the “ Order line.” Upon one or the other of these hypotheses, I think a probable solution of the difficulty may be accomplished: and it can occasion no surprise that a man *223 who though of vigorous mind, was yet of but limited education and no doubt but little accustomed to systematize bis thoughts or to reduce them to writing, should when he attempted to do- so, be betrayed into inaccuracies and evince a want of order and method in the arrangement of his ideas and in the manner of giving expression to them. But if any solution of this difficulty were impracticable, I should think it less objectionable to disregard this doubtful call altogether than to reject all the particulars of description by boundaries in the devise, when from the particular form of expression adopted it is manifest that they either were or might have been intended to narrow the subject pointed at, and to restrict the gift to part instead of giving the whole.
I think therefore the piece of land between the fence and the branch is a subject which satisfies the description found in the devise when viewed in the light of the surrounding circumstances: that no evidence can therefore be received to prove the actual intention of the testator to give a greater or different subject, and that although possibly the testator may have intended to give more, yet the devisee can claim nothing but the subject so described.
But if it could be shown that this piece of land does not satisfy the description of .the subject devised to Mrs. Wootton by the will, still I think the result to which we must be brought will be the same.
I have already endeavored to show that words of description in a devise can only be rejected where the subject is already sufficiently and clearly designated, and it is manifest they are merely words of description superadded where the subject is already perfectly described. If the words be restrictive, they never can be rejected; and it must be equally clear that they cannot be rejected if it be doubtful as they stand, whether they are descriptive merely, or descriptive *224 and restrictive. For while there is such doubt, it never can be said that the subject is clearly and sufficiently described. Nor in such a case will the law intend error or falsehood. Doe v. Greathed, 8 East’s R. 91, 104. Here then if the strip of nine acres does not satisfy the description given in the devise, it must be absolutely uncertain what it is they do describe, and whether the boundaries given were intended to be descriptive merely or restrictive also. The form of expression adopted, followed up by particulars of local description by boundaries, is such that it is at least doubtful whether the testator, by the terms “ Marrow-bone lands,” referred to the lands on both sides of the creek, or on one side only. And if it be so, you cannot safely reject those particulars of description, and give effect to the previous clause, without regard to them. Before you can do so, you must first be satisfied that they were not intended to be restrictive. The testator then has given all that part of his Marrow-bone lands whereon he then lived in the county of Henry, beginning at the Pole bridge, running up the branch to its head, and thence with the line named to the “ Order line.” What part of these lands is thus described? What fixes and determines its extent? We have here an irregular line betweeen the Pole bridge and the “ Order line,” given as a base line upon which may be described an infinite series of diagrams, all varying in the quantity of land contained. And this uncertainty as to the extent of the subject devised must be equally fatal to the pretensions of the appellant. For a party claiming under a devise must show with certainty what subject was intended to be given. If the words of the will describe nothing, or if with the aid of the surrounding circumstances, they are insufficient to determine the testator’s meaning, or to enable the judicial expositor to ascertain with legal certainty what is the exact subject devised, the testa *225 mentary disposition must be ineffectual and void for uncertainty. Wigram, Prop. 6, p. 83; Doe ex dem. Dell v. Pigott, 7 Taunt. R. 553; Richardson v. Watson, 4 Barn. & Adolp. 787; Mason v. Robinson, 2 Sim. & Stu. 295; Tolson v. Tolson, 10 Gill & John. 159.
If then the strip of nine acres satisfies the words of description in the devise, the Circuit court has not erred in decreeing it to the appellant. If, however, the devise is void for uncertainty, the appellant gets the nine acres under it: and of this the appellees do not complain, and the appellant cannot. In either view, therefore,'! am of opinion to affirm the decree.
Daniel and Moncure, Js. concurred in the opinion of Lee, J.
Allen, P. and Samuels, J. dissented.
Decree affirmed.