Staples, J.
delivered the opinion of the court.
The only question presented for our decision in this-case is, whether the papers offered for probate in the' court below are valid testamentary instruments. This question has been very ably argued on both sides, and the whole law of the case examined and discussed. Before considering the papers which are the subject of controversy, it may be well to state very briefly the principles which will control our decision.
All the authorities hold, indeed it is very clear, it is not necessary to the validity of a will that it should have a testamentary form, or that the decedent should know that he had performed a testamentary act, or that he should intend to perform such act. A deed poll, or an indenture, a bond, a marriage settlement, a letter, a promissory note, and the like, have been held valid as a will. If the paper contains a disposition of the property, to take effect after the death of the testator, though it was not intended to be a will, but an instrument' of a different shape, yet if it cannot operate in the character in which it was intended, it may operate as a testamentary act. 1 Lo-max on ExTs, pages 33, 34.
It is not necessary that the paper should be the identical one intended by the testator for his last will and testament. If the instrument has once received the sanction of the testator as the final disposition of his property, it will so remain until revoked or ean *481 celled in some one of the modes required by the statute. He may have always intended to make another will, but until that intention is consummated by the execution of a posterior instrument, the first will stand as the last will and testament, however little it may reflect the wishes of the testator.
It is necessary, however, that the instrument, whatever it may be, whether a note, settlement or deed, should have been designed to operate as a disposition of the testator’s property. That identical paper must have been intended to take effect in some form. It must have been written animo testandi. In the language of Judge Cabell, “ A paper is not to be established as a man’s will merely by proving that he intended to make a disposition of his property similar to or even identically the same with that contained in the paper. It must satisfactorily appear that he intended the very paper to be his will. Unless it does so appear, the paper must be rejected, however correct it may be in its form, however comprehensive in its details, however conformable to the otherwise declared intentions of the party, and although it may have been signed by him with all due solemnity.”
This doctrine is sound in principle, is commended by its intrinsic justice and wisdom, and is fully sustained by the authorities. Sharp v. Sharp, 2 Leigh 249; Hooker v. Hooker, 4 Gratt. 277; Walke v. Walke, 1 Gratt. 454; Pollok & wife v. Glassel, 2 Gratt. 439.
To this rule there is, however, one apparent exception, or rather a modification of it. It is where the draft or notes of a will embody the provisions actually designed by the testator with reference to his property. If such notes or draft declare the settled purposes of the testator, they will be established as his will, although his purpose may have been to extend the *482 notes or draft into a more regular form. This, however, is only permitted where the testator is prevented by the act of God from completing the instrument in f°rm which he designed it. Even here it is essential that the paper shall contain the final determination of the testator with regard to the disposition of his estate.
With this single exception, for I know of no other, the paper offered for probate must have been intended by the testator as an operative instrument. He must have designed thereby to dispose of his property. He must have looked to that paper as the means by which an object was to be accomplished, and that object the distribution of his estate after his death. Unless he intended this, the paper is not his will, whatever he may have called it. If he did so intend, it is his will, whatever he may have called it. The intention is the controlling principle in such cases. The courts will ■ not force a man into the performance of a testamentary act against his deliberate intentions.
Applying these principles to the case before us, the result is a matter of no serious difficulty. The papers offered for probate in this case, consist, 1st, of a letter written by James J. McBride, the decedent, to his brother, John J. McBride, dated May 20th, 1872. This letter is signed only with the initial letter J. It was mailed at Brownsburg, Rockbridge county, Va., and was directed to Palestine, Anderson county, Texas. The person to whom it was addressed did not reside in Palestine, but in Galveston, Texas. It seems that the writer did not know where his brother resided. It is supposed that he directed the letter to Palestine because he knew that John J. McBride owned property in that place.
The other paper offered for probate is the draft of a *483 will, prepared in due form by an attorney, with a regular attestation clause for witnesses, but never executed by the decedent. It is not pretended that this paper is a valid testamentary act. It is probably offered in connection with and as explanatory of the letter, and as showing that the dispositions of the property, as expressed in the letter, are identical with those in a paper carefully prepared-by counsel, by the instructions of the decedent. The. main and the only reliance of the appellant’s counsel is upon the letter already mentioned. The first part of this letter is upon a matter of business having no connection with the subject of controversy. The writer then gives a somewhat detailed account of his domestic troubles, his want of confidence in his wife, his thorough conviction of her infidelity, the negotiations between them for a separation and divorce, the settlement to be made upon her, and his suspicions that she was attempting to defraud him in this settlement. He also states the birth of his wife’s child in the month of December previous, his belief that the child was not his, and his fixed purpose that it should never inherit any part of his estate. He then states: “For fear of the child coming in for my property, I have made my will, leaving my property to be equally divided between John J. McBride, Zach’y McChesney, Jackson and Any McBride (each one-fourth), and leave yourself and Capt. D. P. Curry my executors.” Further on he says: “It is not such a will as I expect to make, but do it at present to cut out the child in case I should die without making any other arrangements.”
At the time this letter was written, the draft of the will already mentioned had been prepared and was in the possession of the attorney who had written it. The reference made in the letter was doubtless to this draft, *484 as there is no evidence showing or tending to show the existence of any other testamentary paper executed by the decedent. As already stated, the letter is dated 20 May 1872; the decedent was thrown from his horse on the 28th of May, and died on the 80th. The draft of the will was prepared about two months before; was handed to him by the attorney, and then returned to the latter, with the remark that he would execute it: but no day was appointed for the purpose. It was again shown to the decedent some eight or ten days before his death, and, as would seem, about the time the letter was written. He said he would meet the attorney in a few days, and execute the paper; and he named the attesting witnesses; but he fixed no day, nor did he even indicate the time for the execution of the paper. He never expressed, says the witness, any doubt or vacillation as to his purpose. That he was fully aware of the importance of immediate action, there cannot be a question. He was frequently told by his attorney that it was very important for him to attend to the matter; that be had his purposes to carry out, and they could not be effected without the execution of the instrument. During the two months immediately preceding his death, the decedent was in good health, in possession of his faculties, mental and physical, with ample leisure and the fullest opportunity for signing the paper. He is represented by all the witnesses as a man of decided character, decisive in his purposes, and prompt in their execution.
Why, then, did he not attach his signature to the instrument: why did he postpone it from day to day, and even for months ? Who, looking to this record, can comprehend his motives? It may have been that spirit of procrastination and delay in regard to the execution of last wills and testaments which so often *485 springs from youth and health and the confidence in a long life. It'may have been that he was not fully satisfied of the illegitimacy of the child, that he still had ■doubts and hopes upon that subject, and was therefore reluctant to take the final step of disinheriting it. _ . . ... „ . ¡supposing that his purposes on this point were fixed, it may be that still he was not satisfied with the dispositions he had made, that there were other objects of his bounty having equal claims upon him who were not provided for in this draft of his will. With the lights before us, how are we to say which of these theories is correct, or whether either is correct. In his letter he is careful to say, it is not such a will as he expected to make. He says it more than once, and that it was only done to exclude the child in ease he should die without making other arrangements.
What were those other arrangements? We have no means of determining. Whatever they may have been, it is very certain that the dispositions of his estate, as made in the draft and mentioned in the letter, were not satisfactory to the decedent. They were not such as he desired or expected finally to make: they were to be merely temporary. But, temporary as they were, as anxious as he was to cut off the child, he still hesitated, and at last failed to sign the paper by which the persons therein named were to take his entire estate to the exclusion of all others. His unwillingness that they should so take may have been the cause of this otherwise inexplicable delay. He no doubt thought that he had ample time to make a will such as would carry out his final intentions with reference to his property. With this positive knowledge that he declined, or at least failed, so long, without any satisfactory reason suggested, to execute the draft of the will, how can we consistently set up a *486 mere letter as a testamentary act, identical in its provisions with the unexecuted draft. If he was unwilling to sign the draft prepared for him, could he have ever intended, or even imagined, that the letter would be used to establish his final disposition of his property? A letter not testamentary in form, written with no testamentary intent, and containing upon its face the strongest evidence that the dispositions now claimed were not satisfactory, and were not such as he designed finally to make.
In striking confirmation of the view that this paper was never intended as a will, was never designed to operate in any form, is the direction given by the writer to his brother to burn the letter. The learned counsel for the petitioners says that this direction applies only to the domestic portion of the letter, and not to its testamentary purposes. But the letter is all domestic; it is a narrative of domestic matters, written apparently in answer to inquiries made by the brother residing in Texas; and the testamentary dispositions, if they may be so termed, are so blended with the story of his domestic troubles that the destruction of so much of the letter as relates to the latter necessarily involves the destruction of the entire paper.
It is very true that when a will is once properly executed, a mere direction by the testator to destroy it, and a belief on his part that it has been in fact destroyed, will not operate as a revocation. The direction must be followed by a substantive act of destruction. But when an attempt is made to establish a mere letter as a testamentary act, a request of the writer to destroy the letter leads irresistibly to the conclusion, his purpose was that that paper at least should not be his will. To treat it as such because *487 the writer has mentioned his views and purposes with regard to his estate, is palpably to violate his intentions, and to make that effectual which he intended should have no effect whatever.
It is impossible to foresee the mischiefs that will result, if a doctrine of this sort is established as the law of the land. The mischief of converting private letters into wills—of clothing loose and unguarded expressions with the solemnities of testamentary acts— is too obvious to require comment or discussion.
Looking at the letter in this aspect alone, it lacks one of the main essentials of a testamentary act.
In determining whether this letter constitutes a valid testamentary act, there is one other view which ought not to be omitted. It has been held in England that a will is valid if signed with the initials of the testator’s name, or even his mark without any signature. It must be borne in mind, however, that under the English statute every will, even though written wholly by the testator, must be attested by witnesses. When, therefore, in England, an initial is used only, the attestation of the witnesses very clearly indicates that the testator designed that this form of signature should be a signing. Under our statute, an autograph will is valid without witnesses. Whether we can recognize an initial as sufficient, to the same extent as the English courts, may not be so clear. Upon that question we express no opinion. Its decision is not necessary for any of the purposes of this case.
Our statute, it will be observed, contains an important provision not found in the English statute. It requires that “ the will shall be signed by the testator, or in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature.” In the construction of this provision it *488 has been held that no will is sufficiently signed unless it appears affirmatively, from the position of the signature, or from some other internal evidence equally convincing, that the testator designed by the use of the signature to authenticate the instrument. Waller v. Waller, 1 Gratt. 454; Ramsey et als. v. Ramsey’s ex’or, 13 Gratt. 664; Roy et als., v. Roy’s ex’or, 16 Gratt. 418. It is true that these cases turned upon the question of the finality of the testamentary intent, the question being whether the paper was to be regarded as a final and concluded act. The principle is the same, however, and is equally applicable in the present case. The signing must be such as upon the face and from the frame of the instrument appears to have been intended to give it authority. It is said that the design of our statute is probably the same in effect as that which the English statute requires when it says that it shall be signed at the foot or end thereof by the testator and be attested by witnesses. Under both statutes, the identity of the instrument is ascertained and its finality and authenticity established without resort to extrinsic evidence.
In the case before us, the letter is signed only with the initial of the writer’s Christian name. In the concluding part he says: “I don’t know where to direct this letter, and don’t like much to send it on uncertainties, and will not sign it; you know who it is from if you get it;” and then follows the letter J. The paper does not show where it was written or mailed; neither state, county nor post-office is given. So far from the signature being intended to give it authenticity, it is very apparent that this form of signing was adopted to conceal the name of the writer. His purpose was not to identify himself with the paper, but to prevent even a suspicion of his connection with it in any form. *489 And no one, unacquainted with the history of the man ■and his family, could by possibility tell where or by whom the letter was written. The brother to whom it was addressed was expected to understand the allusions from his own independent knowledge of the writer and the transactions to which he refers. If the letter reached its destination, it would be immediately destroyed; if it did not, the name of the writer, and even his residence, would be unknown, and his narrative without interest to strangers. The conclusion is irresistible, that he did not intend this “initial” letter as a signing within the true intent and meaning of the statute.
Upon the whole we are of opinion there is no error in the decree, and that it must be affirmed.
Decree aeeirmed.