# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤,

## FRENCH v. FRENCH.

1878
Special Term.

Decided December 14, 1877.

1. A paper-writing in these words, viz: "Let all men know hereby, if I get drowned this morning, March 7, 1872, that I bequeath all my property, personal and real, to my beloved wife, Florence, witness my hand and seal, 7th March, 1872. "WM. T. FRENCH," was on the 4th day of May, 1876, propounded in the circuit court of the county of Hampshire for probate and record, by Florence French, the devisee named in said paper-writing; and it appearing to the said court "from the testimony of Hampton Stump and Charles French that said paper-writing and signature were wholly in the handwriting of said William T. French, deceased, and that he was of sound mind and memory at the time of the execution thereof, the said paper-writing was admitted to probate as the will of the said Wm. T. French, deceased, and ordered to be recorded." William French, the father of said Wm. T. French, deceased, and his sole heir at law, filed his bill in the circuit court of said county of Hampshire against said Florence French, alleging the admission of said paper-writing to probate as aforesaid, and averred in his bill, that said paper-writing, so admitted to probate as and for the last will of said Wm. T. French, was not the will of said William T. French; that it was not intended by him as and for his last will and testament; that upon the face of said paper is set forth a contingency, to-wit: "If I get drowned this morning, March 7, 1872," which did not occur, and which is a condition necessary to the validity of the said will;" and prayed the court by reason thereof to direct certain issues &c., and that the said paper be impeached, set aside and declared not to be the last will and testament of

said Wm. T. French, deceased. The defendant, Florence T. French, answered the bill, alleging that the said paper writing as admitted to probate was the completed will of her husband and his absolute will and testament. And she denies, that the operation and effect of said paper-writing as a will depended on any condition or contingency in said will contained, but that the same only expressed the reason and motive of the testator for making the will on the occasion of its date. And it appears that the parties waived an issue to be tried by a jury and submitted the cause to the circuit court for decision; and the circuit court decreed, "that the paper admitted to probate as the last will and statement of Wm. T. French, deceased, is his true and valid last will and testament, and that it does operate to pass to Florence French all the estate, real and personal, of which said William T. French died seized and possessed," and dismissed the plaintiff's bill with costs &c. It appears in the cause, that said Wm. T. French never had any children, and that he died· on the 29th day of December, 1874, and that at the date of said paper-writing the said Florence French, the wife of said Wm T. French, would under the statute of descents and distributions then in force have been the sole legal heir and distributee of her said husband, if he had died at any time during the day of the date of said paper-writing; but that after the date of said paper-writing, and before the death of said French, deceased, to wit, on the 22d day of December, 1873, the statute of descents was so amended, that under its provisions as amended the plaintiff, as the father of the said deceased French, was on the death of said deceased (he having died without leaving any child, or the descendants of any child) his sole legal heir; and it was proved by the plaintiff that the testator wrote the will in the presence of his wife, and handed it to another lady to read .in the presence of his wife, and then handed it to his wife directing her at the same time to take care of it, and in accordance with such direction she put it away with important papers of the deceased, where it remained until about a week prior to his death, when she put it among other important papers and there preserved it until after the death of the testator; and that the morning the decedent so wrote the will he was starting to go across a deep river, and his wife being afraid some accident would happen was anxious that he should not go, and decedent started out of the room and then came back and sat down and wrote the will. HELD:

For reasons and upon grounds stated in the written opinion of a majority of this court, that the said decree of the said circuit court is substantially correct, and that there is no error .therein for which it should be reversed,

2. In expounding a will the court will make the amplest allowance for the unskilfulness and negligence of the testator; technical informalities will be disregarded; the most perplexing complication of words and sentences will be carefully unfolded; and the traces of the testator's intention will be diligently sought out in every part of the instrument; and the whole carefully weighed together.

3. To aid in ascertaining the true construction of the will, evidence may be received of any facts known to the testator, which may reasonably be supposed to have influenced him in the disposition of his property; and as to all the surrounding circumstances.

4. Parol declarations of the testator cannot be admitted to control the construction of a will; and declarations of the testator as to his intention to make a particular bequest, or that he has made such a bequest, cannot be admitted for that purpose, except when the terms used in the will apply indifferently without ambiguity to each of several different subjects or persons; when evidence may be received as to which of the subjects or persons so described was intended by the testator.

5. This suit being brought by the legal heir of the decedent against the defendant to set aside the will of the decedent, it is not competent for the defendant to testify in her own behalf on her cross-examination by her counsel as to a communication had by her personally with the deceased, under the second paragraph of section twenty-three of chapter one hundred and thirty of the Code, she having been first examined in chief by the legal heir and not as to said communication or conversation, the said communication or conversation being new matter introduced by the defendant in her own behalf. Quære: Can a defendant in such case testify in his or her own behalf, after being examined in chief by the legal heir, as to facts, communications, or transactions had by her personally with the deceased in explanation of such facts or communications or transactions had by him or her personally with the deceased drawn from him or her by the examinations made by the legal heir?

6. If a will is clearly conditional and contingent, and the contingency contemplated by the will did not happen within the time specified, the recognition of the will by the testator after the failure of the contingency by mere verbal declarations does not revive or continue the will as an absolute valid will.

7. The will in this case being absolute, and the law having made a change in heirship between the date of said will and that of the testator's death, the testator is presumed to have contem-

plated the possibility of such change in makiing his said will, and in such case as this the will will be held valid.

Appeal from a decree of the circuit court of Hampshire county, rendered on the 12th day of December, 1876, in a cause in said court then pending, wherein William French was plaintiff, and Florence French was defendant, allowed on the petition of said William French.

Hon. John Blair Hoge, judge of the third judicial circuit, rendered the decree appealed from.

The facts of the case appear in the opinion of the court.

*John J. Jacob*, for appellant, cited the following authorities:

Shep. Touch. 401; 1 Redf. Wills (2d ed.) 170, 171 and n 22 ; 2 Phillim. 180; 4 Gratt. 277; 2 Leigh 262; 26 Gratt. 476 ; Williams, Ex'rs 60, n 1 ; 1 Curtis 9; 1 Hag. 25 ; 1 Gratt. 83; 1 Redf. Wills 425, 426 and n.; 5 Leigh 237, 239, 242; 6 Munf. 386 ; 12 Gratt. 205, 206 ; 1 Chit. Bl. Com. 450, n. 6; 1 Phillim. 22 ; 3 Phillim. 321; 10 Leigh 125 ; 2 Leigh 249 ; 13 Gratt. 964; 16 Gratt. 418 ; Code, Ch. 78. §§1, 9; 2 Bl. Com. 242; 5 Leigh 237; 3 Lom. Dig. 105; 2 Phillim. 180; 1 Ves. Sen. 190; 2 Amb. 557; 6 Ves. 608; 2 Phillim. 294 ; 1 Desauss. 543, 554, 557; 2 Harr. & J. 346; 2 Watts & S. 145; 3 Metc. (Ky.) 101; 4 Metc. (Ky.) 25 ; 41 Miss. 17; 14 M·>. 171 ; 1 Saund. 278, n. 4 ; 1 Redf. Will 170, 171, §7; 2 Sw. & Tr. 147 ; 1 Redf. Wills. 430; *Id.* 426, 427; *Id.* 432, 433, 434, 435 ; 1 Gratt. 454; 12 Gratt. 196 ; 19 Grrtt. 793; Potter's Dwar. Stat. 182; 3 Call 353, 354; 3 Rand. 282; 1 Redf. Wills 421, 422 ; 3 Pillim. 209 ; 9 Pet. 174; 27 Gratt. 313; 1 Probate & Divorce 88; 2 Sw. & Tr. 147; 8 Allen 192 ; 2 Metc. (Ky.) 364; Code, ch. 77, §§7,8; 2 Leigh 255, 265 ; 1 Rob. 346 ; 1 Gratt. 161; *Id.* 454; 12 Gratt. 206, 207, 208 ; 13 Gratt. 666 ; 14 Gratt. 332 ; 26 Gratt. 481; Lom. Exrs. (2d ed.) 160, 161 ; 4 Wash. C. C. 262; 4 Cow. 490;

8 Conn. 263, 264; 4 Dutch. 274; 1 Lans (N. Y.) 150; 1 Williams' Exrs. 178, 179; Amb. 557; 5 Bing. 435; 8 Ad. & E. 14; 5 M. & W. 363, 367; 8 Ves. 22; 1 Saund. 278 and n.; Code, ch. 130, §23; Id., ch. 77, §18.

*Holmes Conrad*, for appellee, cited the following authorities:

Code, ch. 7, §3; 7 Rob. Prac. 335; Shep. Touch. 404; 2 Leigh 262; 2 Gratt. 277; Code, ch. 77, §10; 2 Wall. Jr. C. C. 368; 1 Redf. Wills 433, 434; 2 Probate & Divorce 22; 3 Phillim. 209; 19 Gratt. 784; 2 Phillim. 293; 1 Williams Ex'rs, 154; 17 Gratt. 47; 1 Gratt. 454; 13 Gratt. 664; 16 Gratt. 418; 26 Gratt. 476.

HAYMOND, JUDGE, delivered the opinion of the Court:

The plaintiff filed his bill against defendant in the circuit court of Hampshire county, in which he alleges, that William Taylor French departed this life on or about the 29th day of December, 1874, leaving no children, but leaving his wife, Florence French, surviving him; that plaintiff is the father of the said William Taylor French and his heir at law, that on the ———— day of May, 1876, the said Florence French propounded in the circuit court of Hampshire county as for the last will and testament of the said William Taylor French, deceased, a certain paper-writing in the words and figures following, to-wit: "Let all men know hereby, if I get drowned this morning, March .7, 1872, that I bequeath all my property, personal and real, to my beloved wife, Florence. Witnesss my hand and seal, 7th of March, 1872.

WM. T. FRENCH."

That the circuit court admitted the said writing to probate as and for the will of said William Taylor French. A copy of the order of the circuit court admitting said will to probate is filed with the bill as an exhibit marked No. 1.

Plaintiff avers, that the said writing so admitted to pro-

bate was not the will of said Wm. Taylor French; that it

was not intended by him as and for his last will and testament; that upon the face of said paper is set forth a contingency, to-wit: "If I get drowned this morning, March 7, 1872," which did not occur, and which is a condition necessary to the validity of said will. The prayer of the bill is, that the court shall ascertain by the trial of proper issues whether the said writing be the will of the said William French or not; that the same be impeached, set aside and declared not to be the last will and testament of said William T. French; and that such other relief be extended to plaintiff as the case may require, and the rules of equity permit. The defendant filed her answer to the plaintiff's bill, which is in substance as follows: That she demurs to the bill for want of equity on its face, and for plea thereto says, that the question whether the paper referred to "be the will of William T. French or not" has been ascertained and determined by the adjudication of this Court, as appears by the order of the circuit court filed with the answer. And the answer avers, that the will admitted to probate was made and completed by her husband, W. T. French, as and for his absolute last will and testament, and he did so make and subsequently recognize it as his solemn and deliberate act testamentary. The defendant denies that the operation and effect of said will depended on any condition or contingency in said will contained; but that the same only expressed the reason and motive of the testator for making the will on the occasion of its date; and she prays, that the will may be declared the absolute last will of W. T. French, deceased.

Plaintiff's exhibit No. 1 referred to and filed with his bill is as follows, viz:

"WEST VIRGINIA, HAMPSHIRE COUNTY, To WIT:

. At a circuit court of Hampshire county continued and held at the court house of said county, on the 4th day of May, 1876, a paper writing in these words and figures,

to-wit: 'Let all men know hereby, if I get drowned this morning, March 7, 1872, that I bequeath all my property, personal and real, to my beloved wife, Florence. Witness my hand and seal, 7th March 1872—Wm. T. French," was propounded in this court as the last will and testament of William T. French, deceased, by Florence French, the devisee named in said will; and it appearing to the court from the testimony of Hampton Stump and Charles French, that said paper-writing and signature were wholly in the handwriting of said William T. French, deceased, and that he was of sound and disposing mind and memory at the time of the execution thereof, the said paper-writing was admitted to probate as the will of the said William T. French, deceased, and ordered to be recorded according to law."

The order of the circuit court filed with the defendant's answer is the same as exhibit No. 1. filed with plaintiff's bill.

It appears that the plaintiff took and filed in the cause the following deposition, viz: Deposition of Mrs. Florence French.

"First question by counsel for complainant—Are you the widow of W. T. French, and were you present when he executed the paper propounded by you as his last will and testament and admitted to probate by the circuit court? If you were, state all the circumstances attending the same, stating fully all the conversation between you and him on the subject and any and all statements made by him at that time on the subject ·

"Answer—I am the widow of W. T. French. I was present when he executed the paper referred to. The day he wrote this will the river was very deep, and he started to go across the river, and I was very anxious for him not to go; I was afraid some accident would happen; I tried to persuade him not to go; he started out of the room and then came back and sat down and wrote that will; I am not certain whether Miss Lizzie Pugh, who is now the wife of the plaintiff, William French, was in

the room when he wrote the will; but if not, she came in, and he handed her the paper, and told her to read it.

"Second Question—State the manner in which W. T. French wrote the paper. Was it not done in rather a laughing way, and did he not state that you need not be afraid of the consequences, if he did get drowned that morning, as you would be all right, or something to this effect?

"Answer—I thought he was in earnest; I don't recollect of his laughing at all; if I had not thought him in earnest, I should not have presented the paper. If he made any such statement, I don't recollect it.

"Third question—State what disposition was made of said paper after its execution, and what became of the same, and when and where it was found after the death of W. T. French?

"Answer—I was in the habit of keeping my husband's papers; he generally gave them to me to take care of; I put that paper in a box with some receipts, and about one week before my husband's death he told me to look up a receipt for him; and in looking for the receipt I came across this will, and took it and put it in another place, in my top drawer, in a box in my room with some other important papers that I had; and for that reason I had difficulty in finding it when I was looking for it, because I had forgotten where I had put it; I could not tell where to look the first time, because my cousin was looking and I could not direct her where to look for it; my mind was so confused at the time on account of my trouble. This occurred after the death of my husband. After this I went to Baltimore and spent a month; and while there thought over the matter, and then recollected exactly where I had put it. When I returned from Baltimore, I went to the place and found it myself."

Cross-examined by counsel for the defendant:

"First question by defendant's counsel—State whether or or not your husband, W. T. French, did ever, at any time subsequent to the making of said will, recognize the

same as his will; if so, when and how?" (Excepted to by plaintiff's counsel.)

"Answer—A short time after he wrote the will, not over a week, he asked me what I had done with the paper. I said, 'Is that paper any account?' And he said, 'just as much so as any will; all a man has to do now is to write his own will, and he can do that in a very few words;' and he referred to the case of Col. Isaac Parsons, who had written his own will and it had held good in law; and he said, 'I want you to take care of that paper.' at another time, in the presence of Miss Lizzie Pugh, now Mrs. French, Miss Rebecca Swisher and myself and my husband Miss Pugh said to Miss Swisher: 'Did you know that Mr. French had made his will?' And then I stated the circumstances as I have just stated them—how he happened to do it; and Miss Swisher turned to Mr. French and said to Mr. French: "How did you happen to think of writing your will; you don't look anything like dying?' And he replied, 'I don't know what might happen to me and I wish my wife to have my property.' (The answer is objected to by plaintiff's counsel). And further deponent saith not."

It appears that the defendant took and filed in the cause the following deposition, viz: Deposition of Rebecca Swisher:

"First question by defendant's counsel—State your name, age and residence.

"Answer—I am thirty years old; name, Rebecca Swisher, and reside on Levels in Hampshire county.

"Second question by same—State whether or not you have, at any time since 7th March, 1872, heard William T. French, now deceased, refer to the paper admitted to probate as his will; if so, when and under what circumstances?

"Answer—I was at Mr. French's house a few days after he wrote this will. Mr. and Mrs. French, Miss Lizzie Pugh and myself were sitting in a room together, Miss Pugh said: Mr. French made his will the other day.

1878
Special Term.

French
v.
French.

I wanted then to know why it was he made his will. Mrs. French then told me he was going over the river a few days before, and she objected on account of the river being high, but he started, came back and sat down and wrote his will. I then turned to Mr. French and asked him why it was that he had written his will; he told me that he didn't know what might happen and he wanted his wife to have his property. And further the deponent saith not."

Also the deposition of H. W. Stump which is as follows:

"First question by defendant's counsel—State your name, age and residence?

"Answer—Name is H. W. Stump; my age is forty-three years, and I reside near Clarksburg, W. Va.

"Second question by same—State whether you knew W. T. French, now deceased, anything of his habits of business. Have you ever seen him write, and can you say whether or not he was in the habit of using a lead pencil in writing generally? (Excepted to by plaintiff's counsel.)

"Answer—I knew William T. French, and knew his habits of business. He would write with whichever came the handiest. In business transactions and business letters, he was in the habit of using a pencil.

"Third question by same—Did you ever hear William T. French speak of the disposition of his estate by will? If so, when and under what circumstances?

"Answer—I heard him at one or more times since March, 1872, the date I cannot call to mind with the exception of one, speak of it. He and I got into conversation, and I said: 'How are you getting along?' And he said: 'First rate, and have things in a good way to live, and if I live a year or two longer, will have them in better shape.' And I said: 'What are you going to do with your property when you die? You haven't got any children, and I don't suppose ever will have?' And he said: 'I expect Florence to have my property. I

don't expect to live long anyhow.' This was in October before he was killed. He was killed in December, 1874. On another occasion he said: 'I have got it in my head I am not going to live very long;' and I made light of it and said, 'What are you going to do with your property?' And he said 'I can leave it to my wife.' And further this deponent says not."

The foregoing are all the depositions appearing in the cause.

It appears by the record, that at a circuit court of Hampshire county continued and held at the court house of said county on the 12th day of December, 1876, the court made and entered this final decree in the cause, viz:

" By consent of the parties, by their counsel, this cause came on to be heard upon the bill of William French, the answer of Florence French filed thereto, the general replication to said answer, and the depositions taken by consent and filed in the cause, and the repetition in this case of the formal proof of the execution of said will and the sanity of the testator, introduced at the probate of the will on the common law side of this court at its May term, 1876; and the parties, by their counsel, waiving an issue to be tried by a jury, it was argued by counsel and submitted to the court. On consideration whereof, the court, being of opinion from all the evidence in the cause that the paper admitted to probate as the last will and testament of William T. French is his true and valid last will and testament, that the same was not conditional or contingent in its effects and operation, but was an absolute testamentary disposition of his estate, as such was recognized and referred to by said testator after the date mentioned therein, doth accordingly adjudge, order and decree, that the paper admitted to probate as the last will and testament of William T. French, deceased, is his true and valid last will and testament, and that it does operate to pass to Florence French all the estate, real and personal, of which the said William French died seized and possessed; and it is further adjudged and

ordered, that the bill be dismissed, and that Florence French do recover of William French her costs about her suit in this behalf expended."

From this decree the plaintiff obtained an appeal to this court, and has assigned in his petition for said appeal the following as errors, viz :

"1. The writing in controversy was not a final testamentary act, and not made *animo testandi*, although the court below held otherwise.

"2. The said writing, if a will at all, was made to depend for its effect upon a certain contingency, and was conditional. . The contingency not happening, the will was void, although the court below held otherwise.

"3. The court below erred in considering and relying upon declarations made by the alleged testator subsequent to the execution of said writing, and proved by parol testimony for the purpose of establishing or reviving the same as a valid will.

"4. The court below erred in considering and relying upon the testimony of the defendant, introduced in her behalf, as to transactions and communications had with William T. French, the alleged testator."

I will proceed to consider the foregoing assignments of error, the first two together and the other three separately. The first thing to determine is : *Was the writing in controversy a final testamentary act ?"*

The counsel for the plaintiff, in support of his said first assignment of error, has cited and quoted in his printed brief from Shep. Touchstone, 404, the following : "The second thing required to the making of a good testament is, that he that doth make it have, at the time of making it, *animum testandi, i. e.* the mind to dispose, a firm resolution and advised determination to make a testament ; otherwise the testament will be void ; for if a man rashly, unadvisedly, incidentally, jestingly, or boastingly, and not seriously, write or say that such a one shall be his executor, or have all his goods, or that he will give to such a one a thing, this is no testament."

This quotation is not entirely correct as far as it goes, and is not full. In the paragraph cited and quoted from by plaintiff's counsel Sheppard's Touchstone, at page 404, 2d vol., says: "The second thing required to the making of a good testament is, that he that doth make it have, at the time of making it, *animum testandi, i. e.* a mind to dispose, a firm resolution and advised determination to make a testament; otherwise the testament will be void; for it is the mind, not the words of the testator, that doth give life to the testament; for if a man rashly, unadvisedly, incidentally, jestingly, or boastingly, and not seriously, write or say that such a one shall be his executor, or have all his goods, or that he will give to such a one such a thing; this is no testament, nor to be regarded. And the mind of the testator herein is to be discerned by circumstances; for if at the time he be sick, or set himself seriously to make his testament, or require witnesses to bear witness of it, it shall be deemed in earnest; but if it be by way of discourse only, or of somewhat he will do hereafter, or the like, it shall be taken for nothing."

In 1 Redfield on Wills, 2d ed. 170, 171, cited by plaintiff's counsel, it is said: "And when the paper on its face is equivocal, in order to be treated as testamentary, it must clearly appear that it was intended by the maker to operate as a disposition of his estate after death. 8. But the English ecclesiastical courts have held, that it is not requisite, in order to have a paper operate as testamentary, that the maker should so have intended in all cases, since if the paper contains a disposition of property of the maker, to become, or to be operative after the death of the maker, but was not intended by him to operate as a will, but as a settlement, or a deed of gift, or a bond, if it cannot for any reason operate in that form, the courts have sometimes allowed it to operate as testamentary. 9. But it is not to be inferred from this, that a paper which was not intended to have any operation, as a paper which was drawn up in the form of a will, but not in seriousness and earnest, *animo testandi*, or as

merely preliminary to the settling of a will, can have any such operation as stated above."

The case of *Nichols* v. *Nichols*, 2 Phillim. 180, decides that: "A will, not written with a testamentary intention," will be set aside; and that it was competent to prove by the subscribing witness facts and circumstances tending to show such want of testamentary intention. In this case there was no provision made in the will for his wife (he married after the date of the will), and as facts and circumstances tending to strengthen and confirm the other evidence in the cause, it was allowed to be proved, that the deceased lived on terms of affection with his wife, and he *said he had no will; that the law would make a good will for him.* The court says: "During none of these circumstances does he make any allusion to the existence of this paper. His forgetting it would not operate as a revocation; but it is a circumstance to show that he originally never intended it as a testamentary paper. There is little doubt that when he threw it across the table he meant it should be put in the fire."

In the case of *Trevelyan* v. *Trevelyan*, 1 Phillim. 149, the subscribing witness who wrote the will, as directed by the testator, and subscribed his name to it as a witness deposed that very soon after the will was executed and witnessed, and after he left the deceased, he destroyed it, because he supposed the deceased was not really serious; that he thought the joke had been carried to a sufficient length; still the court established the will. Sir John Nichol, in delivering the opinion of the court in this case, said: "There can be no doubt in law, that if a will duly executed is destroyed in the lifetime of the testator without his authority, it may be established upon satisfactory proof being given of it having been so destroyed, and also of its contents. The question then comes to the facts, and in this case there is abundant proof of the execution and contents of the instrument, as well as of the destruction of it without the authority or knowledge of the deceased. It is not necessary to decide

whether the court could receive evidence against the fact of execution, on the ground that the transaction was throughout a jest; it would be very dangerous to admit any such evidence of intention against the act; though there might be such a possible case, especially if the paper itself contained anything ludicrous or absurd in its dispositions; against this instrument this species of argument cannot be maintained with effect, for the property is bequeathed to the testator's own nephew and god-son. It appears also from the evidence of Mr. Stackpole, that the deceased was very serious in this disposition of his property; the codicils too are a complete recognition and proof also, that he had no knowledge or idea of the destruction of the paper. Under such proof the court is bound to pronounce for the will as contained in the deposition of the witness (this is the mode I believe which has been adopted on similar occasions) and for the two codicils which are sufficiently proved."

In the case of *Hocker* v. *Hocker et al.*, 4 Gratt. 277, "a paper-writing, though in the handwriting of the deceased and signed by him, was held not to be a testamentary paper." The paper-writing in this case commenced: "Directions how I want my will wrote," &c. This writing from its face was not a final act, it contemplated something else yet to be done, to-wit: the writing of the will, &c.

In the case of *Sharp* v. *Sharp*, 2 Leigh 249, the will commences: "My brothers and sisters as followeth" &c. In this case Judge Coulter, who delivered the opinion of a majority of the court, at page 260 says: "It seems to me to result from all the cases, when we are deciding on a paper whether on its face it is testamentary or not, that it is the *mind* not the *words*, the *intention* not the *manner*, which is to be looked to; unless indeed the words or manner show a suspended mind and intention." Again at page 261 he says, "If, however, there be a well founded doubt, arising from the face of this writing, whether it was intended as a testamentary paper or not,

then, it is said, parol evidence may be admitted against it. How stands the case upon the parol evidence?" (Here the judge stated and examined the whole of the parol evidence very fully and minutely). He concluded: "The weight of the evidence, I think, goes clearly to prove, that the testator considered he had a will, by which his estate would pass after his death; and the bulk of it to *Alexander Sharp*, according to his uniform intention in his favor, always expressed to those to whom he made known his wishes. He may have wished to draw it, or have it drawn, in better form; but he clearly intended this paper to be his will, if he should die without altering it. If a will is once made, no expression of an intention to have it drawn in some proper form, or even to alter it, if the testator does not do so, but on the contrary says he has a will, which is found carefully put away, clear of all suspicion of fraud or management, can have the effect of setting aside the will. The evidence in this case, so far from proving an intestacy, I think, supports the paper before us as a will."

In the case of *McBride et al.* v. *McBride et al.*, 26 Gratt. 476, it was held, that "1. It is not necessary to the validity of a will that it should have a testamentary form, or that the decedent should know that he had performed a testamentary act, or that he should intend to perform such act. If the paper contains a disposition of the property to take effect after the death of the testator, though it was not intended to be à will, but an instrument of a different shape, yet if it cannot operate in the character intended, it may operate as a testamentary act.

"2. It is not necessary that the paper should be the identical one intended by the testator for his last will. If the instrument has once received the sanction of the testator, as the final disposition of his property, it will so remain, until revoked or cancelled in a way prescribed by the statute, though he may have always intended to make another will.

"3. It is necessary however that the instrument, what-

ever it may be whether note, deed, letter, or settlement, should have been designed to operate as a disposition of his property. That identical paper must have been intended to take effect in some form. It must have been written *animo testandi*.

"4. But when the draft or notes of a will embody the provisions actually designed by the testator with reference to his property, and declare the settled purpose of the testator, they will be established as his will, although his purpose may have been to extend the notes or draft into a more regular **form**. This however is only permitted, when the testator is prevented by the act of God from completing the instrument in the form in which he designed it. And even in such a case it is essential that the paper shall contain the final determination of the testator with regard to the disposition of his property.

"5. In all other cases the paper offered for probate must have been designed thereby to dispose of his property. He must have looked to that paper as the means by which an object was to be accomplished, and that object the disposition of his estate after his death. Unless he intended this, the paper is not his will, whatever he may have called it. If he did so intend it, it is his will whatever he may have called it. The intention is the controlling principle in such case.

"6. M. has a will prepared by his counsel, which he examines and approves, and says he will meet the counsel in B., a village near, and execute it. A few days after this he writes to a brother in Texas, and after giving him a detailed account of his domestic troubles, which letter he suggests to him to burn, he states that he has made a will, and states the bequests in it, and that he has appointed this brother and his counsel his executors. He says it is not such a will as he expects to make. The letter is signed with the initial of his Christian name, 'J.' Two months after seeing the will prepared for him he is accidentally killed, not having executed the paper. *Held:* 1. The letter is not a testa-

mentary paper, either alone or as connected with the unexecuted will."

In this case Judge Staples, who delivered the opinion of the court, says at page 481 : "It is necessary however that the instrument, whatever it may be, whether a note, settlement or deed, should have been designed to operate as a disposition of the testator's property. That identical paper must have been intended to take effect in some form. It must have been written *animo testandi.* In the language of Judge Cabell : 'A paper is not to be established as a man's will merely by proving that he intended to make a disposition of his property similar to, or even identically with, the same with that contained in the paper. It must satisfactorily appear that he intended the very paper to be his will. Unless it does so appear the paper must be rejected, however correct it may be in its form, however comprehensive in its details, however conformable to the otherwise declared intentions of the party, and although it may have been signed by him with all due solemnity.' "

In the case of *Constable* v. *Steihl and Emanuel,* 1 Hag. 23, by Furguson, it was held according to the syllabus, that "handwriting and finding are sufficient to support a codicil confirming a legacy under a will; which codicil came out of the custody of, and was propounded by, the person solely benefited under it ; who had been sworn executor of the will and codicil four months before producing this paper, and the validity of whose legacy under the will was, at the time, a question depending in the court of chancery. In the courts of probate it is almost a settled principle not to pronounce for disputed papers on evidence of handwriting alone.". In this case the genuinness of the paper was disputed and Sir John Nichol in his opinion in this case says, "These are peculiarly necessary in the present case, when there is much conflicting evidence on this point, for there are a great number of witnesses, also well acquainted with the handwriting of the deceased, who speak to their belief that the pa-

per is a forgery," &c.   1. Williams on Executors, 5th American Ed.

The 5th rule as laid down by Mr. Jarman, as stated by Redfield on Wills, at page 425 and 426 of the 1st vol. of his work, is: "That the heir is not to be disinherited without an express devise or necessary implication, such implication importing not natural necessity, but so strong a probability, that an intention to the contrary cannot be supposed." Mr. Redfield however says in his text, that "in common with all general rules, they will be found to call for considerable discretion in their application to particular cases." Mr. Redfield also in note 1 at the end of said rules says : "Within the last few months the court of last resort in England seems to evince a determination not to allow technical rules of construction to overbear and break down all the better interests, and involuntary sentiments of common sense, and the common experience of mankind, seen in the construction of wills, and we hail the omen with no slight gratification."

In the case of *Boisseau et al.* v. *Aldridges*, 5 Leigh 222, it was held according to the syllabus as follows, viz : "B. in his lifetime signs and seals the following intrument, 'not having made a will so as to dispose of my property, and two of my sisters having married contrary to my wish, I wish this instrument to prevent either of their husbands from having one cent of my estate, say the husbands of my two sisters M. and D. nor either of them to have one cent, unless they survive their husbands; in that case, I leave them $500.00 each to be paid,' &c. On which he endorses 'mem. to prevent *Bennett* and *Buswell Aldridge* (the two husbands) from having any part of my estate, that each might claim in right of their wives, without a will made by me.' *Held:* 1. The instrument is a testamentary paper ; but 2, a man cannot disinherit ihis heirs or next of kin, in any other way than by giving his estate to some one else; and 3, the instrument is not a devise and bequest of the testator's estate by implication, to his heirs and next of kin other than the to wsisters

M. and D. and their husbands; therefore, 4, these two sisters are entitled to their shares of his estate undisposed of by the will; *dissentiente* Tucker, P. as to the two last points."

In this case Judge Brooke in his opinion at page 237 says: "And in examining cases of this kind, we are not to forget that those, who claim under the law, have as strong a claim to the property, as those who claim under the will; indeed somewhat stronger, since it is a settled principle, that if a devise gives no other estate than the law gives, those, who are to take, take under the law and not under the will, their title under the law being preferable to their title under the will." It may be remarked that the last named matter of law stated by Judge Brooke did not arise in the case except by use of illustration. In the same case Judge Tucker at pages 244 and 245 expresses the opinion, that a devise may be created by necessary implication, and that the exclusion of the heir even by implication and without express words *may* raise an estate by implication in another.

The case of *Banks et al* v. *Berth*, 6 Munf. 385, was a case in which the plaintiff filed a bill to perpetuate testimony, and to establish, as the last will of the decedent a paper found in his desk after his death purporting to be such will. In this case the court held, that "notwithstanding a paper purporting to be a will be proved in a suit in chancery to have been wholly written and subscribed by the supposed testator; yet if upon the evidence (there being no attesting witness) it be doubtful whether, at the time he wrote it, he was in a proper state of mind to make a testament, whether it was seriously intended by him as such, or if so, whether it has not been subsequently nullified by the republication of a former will, a revocation of it, or otherwise, the court ought to direct issues to ascertain such facts, before any decision of the cause."

In the case of *Wootton* v. *Redd's ex'r et al*. 12 Gratt. 196 it was held, "1. In expounding a will the court will

Syllabus 2.

make the amplest allowance for the unskilfulness and negligence of the testator ; technical informalities will be disregarded ; the most perplexing complication of words and sentences will be carefully weighed together. 2. To aid in ascertaining the true construction of the will, evidence may be received of any facts known to the testator which may reasonably be supposed to have influenced in the disposition of his property ; and as to all the surrounding circumstances at the time of making the will. 3. But declarations of the testator as to his intention to make a particular bequest, or that he has made such a bequest, is not competent evidence, except when the terms used in the will apply indifferently and without ambiguity to each of several different subjects or persons ; when evidence may be received as to which of the subjects or persons so described was intended by the testator. 4. In construing a will effect must be given to every word, if any sensible meaning can be given to it not inconsistent with the general intention apparent on the whole will taken together. Words are not to be rejected or altered, unless they manifestly conflict with the intention of the testator, or unless they are absurd, unintelligible or unmeaning, for want of any subject to which they can be applied."

In Chitty's Black. Com. side page 450, note 6, it is said : "And the heir will not be disinherited by any implied construction of the devise of his ancestor, for descent is favored ; and this rule applies as well to heirs general as by custom ; and there must be some plain words of gift or necessary implication to disinherit an heir at law."

In *Ramsey et al.* v. *Ramsey's ex'r*, 13 Gratt. 664, it was held, that "the name of a testator at the commencement of a holograph will is an equivocal act, and unless it appears affirmatively from something on the face of the paper that it was intended as his signature, it is not a sufficient signing under the statute. Code, ch. 122, §4, p. 516." The only question in this case was, whether

the name of the testator at the commencement of the will, which was wholly written by the testator, was a sufficient signing under the act. Code, ch. 122, §4, p. 516.

In the case of *Sharp* v. *Sharp et al.*, 2 Leigh 249, the principal question was, whether the paper-writing in question was a mere memorandum of the manner in which the decedent intended to give his property by a will thereafter to be made, or a completed will; and the court, upon proof that such paper-writing was altogether in the handwriting of the deceased, and that his name subscribed thereto was in his proper handwriting, and that it was found in an old pocket-book in the desk of deceased with some other papers, namely, checks, tickets and sheriffs' receipts, established the will.

In the case of *Roy et al.* v. *Roy's ex'r*, 16 Gratt. 418, it was held: "1. In a holograph will the writing of the name of the testator at the commencement of the paper, is an equivocal act, and therefore is not of itself a sufficient signing of the paper to constitute it his will. 2. The paper being folded up and endorsed by the testator with his name as his 'R.'s will' is not a sufficient signing." In this case it was shown, that the alleged will was found in the pocket-book of the deceased after his death, which was locked up in his trunk; that there were bonds, receipts, and other papers in the pocket-book.

In the case of *Ramsey et al* v. *Ramsey's ex'r*, 13 Gratt. 664, it was shown that the alleged will was found after the decedent's death locked up in his drawer folded up in the form of a letter and sealed with a wafer, but without endorsement of any kind. In the said case of *Roy et al.* v. *Roy's ex'r*, 16 Gratt. 418, it is stated by the reporter: "And it being found that the paper as well as the endorsement upon it was wholly in the handwriting of David M. Roy, the only question in this court was, whether it was so signed by the testator as to make it his will."

At the time the paper in controversy in the case at bar was written, March, 1872, under the law of descent and distribution then in force the wife was the sole legal heir and distributee of decedent, there being no children nor their descendants. Code of West Va., chap. 78, §§ 1, 9. In Lomax Digest, 3 vol., marginal page 105, it is stated as law that " Devises are in some cases void *ab initio ;* as where the testator devises what the law already gives, &c. ;" "that it is a rule of law that when a testator makes the same disposition of his estate as the law would have done, if he had been silent, the will being unnecessary is void. Therefore, if a person devises his lands to his heir at law in fee, it is a nullity, and the heir will take by descent, as his better title," &c. This may be true as to lands, as the legal title descends directly to the legal heir. Judge Lomax in the passage just quoted from his work has reference perhaps to real estate and not personal, but this I do not determine. But the 10th section of chapter 77 of the Code of this State provides, that "A will shall be construed, with reference to the real and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless contrary intention shall appear by the will," and a will is ambulatory and cannot and does not take effect until the death of the testator. In 1873 the Legislature of this State passed an act entitled "An act to amend and re-enact section one of chapter seventy-eight of the Code of West Virginia, concerning the course of descents," approved December 22, 1873, which so changed the law of descents in the Code, that on the death of the decedent, he leaving no child nor the descendants of any child, the father was made and became the legal heir as to the real estate. This last named act was in force in December, 1874, when William T. French, the decedent, died. So that between the date of the execution of the will and the death of the decedent the "legal heir" of the decedent was changed from the decedent's wife to his

father. "If the law has made a change in heirship between the date of the will and that of the testator's death, the testator will be presumed to have contemplated the possibility of such change, and to have used his words accordingly." O'Hara on the Construction of Wills, 297; *Aspden's estate*, 2 Wall., Jr., C. C. 368.

It seems to me, if F. makes and executes his will in due form of law, by which he devises his estate to his wife, who at the time of the execution of the will would have been his legal heir if he had then died, but before the death of F. the law is changed, so that the father at the time of his death is his legal heir, the will should ordinarily in that case or a like case be held valid, and not void for that reason; and to that end, if necessary, the court, to carry out the intention of the decedent and to avoid intestacy, would and ought to presume, if necessary, that the will was executed in contemplation that the law might be changed as to heirship before his death. The fact, that at the date of the paper-writing in controversy in this case the defendant, as the wife of the decedent, would have been his legal heir and distributee, and the contents of said paper-writing, may be considered in connection with others *pro* and *con* in determining the question *animo testandi* at the execution of the said paper-writing. *Nichols* v. *Nichols*, 2 Phillim. 180.

In the case of *Cody* v. *Conly et al.*, 27 Gratt. 313, the paper-writing in controversy was admitted to record by the county court of Fairfax county, Virginia in 1868, as the last will and testament of Edmund C. Conly, upon the same being proved to be wholly in the handwriting of the said Conly, and the signature thereto his genuine signature, by the oath of Samuel Farnsworth sworn in open court, and was admitted to probate and ordered to be recorded. The paper-writing in this case was in these words:

"LEWINSVILLE, August 19, 1862.
"*Dear Wife:*
"I am going away; I may never return. I leave my

property to Gaines and Dan; dispose of it as you see fit; don't forget sister Mary and Bridget. Pay William McConly $20.00, Patrick Sulivan $25.00.

"EDMUND C. CONLY.

"*Witness*,

"SAMUEL FARNSWORTH."

In 1869 Mary Cody, a sister of the alleged testator, brought her suit in the circuit court of Fairfax county, to invalidate the said probate. In her bill the plaintiff alleged among others, that she and others were the legal heirs of said Conly, deceased; that the said Conly, who in the year 1862 was a resident of said county and possessed of some lands and personal estate, in view of the civil war then raging contemplated leaving his residence and going abroad, and wrote a letter, as is alleged, to his wife, Margaret Conly, which letter is the paper-writing aforesaid; that said Edmund Conly never left his home, but continued to reside in Fairfax county until his death in 1868; that during his life he purchased a farm near Lewinsville, and placed the complainant, Mary, his sister, in possession of the same, for the use and benefit of herself and family, free of rent, and of which property she was still in possession; that after the death of said Edmund C. Conly the letter aforesaid was admitted to probate in the county court of said county, as the last will and testament of said Edmund C. Conly, on the oath of Samuel Farnsworth, who testified that said paper was wholly in the handwriting of said Edmund C. Conly, and his signature was genuine. Full proof was required of the genuineness of the latter; and even if genuine, complainant claimed that it was not the last will and testament of said Edmund C. Conly, or that he ever intended it to operate as such. Moreover even if said paper might be regarded as testamentary, complainant contended that it would be void for vagueness and uncertainty, and that the probate was also void, the said paper having been proved only by one

witness, &c. The bill prayed that said will and probate thereof might be cancelled and declared void, &c.

The widow, Margaret Conly, who filed her answer, among others related the following facts in substance: That her husband died in February, 1868, leaving personal estate worth some $500.00 or $600.00 and two small tracts of land containing sixty-three acres and one hundred acres, which latter he purchased four or five years before his death and rented to the complainant, &c.; that he died without children, and that his heirs at law might be correctly named in the bill. She averred however, that the paper, referred to in the bill as having been admitted to probate, did contain the disposition of his property as he had frequently expressed to her. The two boys named therein James and Dan, were the children of her brother John Donavan, whose wife at her death left two small children, the boys above named, and at the instance and request of respondent's said husband these two children were taken by her to their house, where they have remained ever since, a period of upwards of sixteen years. The said boys were then (in October, 1869) nineteen and seventeen years of age. She further averred that she had frequently heard her husband say, both before and after the date of said will, that the two boys should have whatever he had to leave; that having been raised by him they felt like his children and should stand in place of children to him, &c.

In November, 1869, the cause coming on to be heard in the said circuit court, a decree was made, that there should be a new trial by jury on the common law side of the court to ascertain whether any, and if any how much, of the said paper-writing, in the bill and proceedings mentioned, offered in the county court of Fairfax county and there admitted to probate as the will of Edmund C. Conly, deceased, was the will of the decedent; and that in the trial the bill, answer and exhibits might be read. In November, 1871, the issue was accordingly tried by a jury, which found a special verdict in these

words : "We the jury, sworn to speak the truth, upon our oaths say that the paper-writing, headed '1862 Lewinsville, August 19,' and which was admitted to probate in Fairfax county court September, 1868, as the last will and testament of Edmund C. Conly, is in the handwriting of Edmund C. Conly ; and we find that at that time, that portion of the county of Fairfax, in which Edmund C. Conly resided, was alternately in possession of the Federal and Confederate forces, and that said Edmund C. Conly expressed fears of being taken away by the Federal forces ; that Edmund C. Conly resided at Lewinsville during the war, and never abandoned his home, but continued to reside there up to the time of his death, and that the citizens of that portion of the county were generally apprehended and carried away as prisoners, with the exception of the said Conly and James Magurity ; but whether or not, upon the whole matter aforesaid, the said paper-writing herein set forth be the said last will and testament of the said Edmund C. Conly, the jury do not know. Therefore they pray the advice of the court ; and if upon the whole matter it shall seem to the court that the said paper-writing is the last will and testament, in whole or in part, of the said Edmund C. Conly, then the jury find that the said paper-writing is the last will and testament of the said Edmund C. Conly; but if upon the whole matter aforesaid it shall seem to the court that the said paper-writing is not, in whole or in part, the last will and testament of the said Edmund C. Conly, then we find that it is not the last will and testament of the said Edmund C. Conly."

The case being heard and considered by the court upon the special verdict, and it seeming to the court upon the facts therein that the paper-writing therein referred to is the last will and testament of Edmund C. Conly, it was afterwards, on the 6th day of December, 1871, decreed by the said court accordingly.

From the decree aforesaid, declaring the said paper-writing to be the last will and testament of the said Ed-

mund C. Conly, the complainant, Mary Cody, appealed to the Court of Appeals of Virginia ; and the first error assigned was : "1. The said paper is not to be regarded as the last will and testament of the said Edmund C. Conly, the same being a devise (if so to be construed at all) contingent upon the happening of an event which never occurred, whereby the whole disposition intended by the said writing becomes inoperative and ineffectual." The Court of Appeals affirmed the decree of the court below. It will be observed that the paper-writing in this case which was established as the last will and testament of the deceased did not appoint an executor, and it does not appear by the verdict where the paper was at the death .of the testator, in whose possession it was, or where it was found. The opinion of the court in this case will be again referred to when I come to consider the subject of conditional or contingent wills.

The 3d section of chapter 77 of the Code of this State, which is the same as §4, of chapter 122 of the Code of Virginia, is in these words: "3. No will shall be valid unless it be in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the same is intended as a signature ; and moreover, unless it be wholly written by the testator, the signature shall.be made or the will acknowledged by him in the presence of at least two competent witnesses, present at the same time ; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary."

The 28th section of said chapter 77 of this State is as follows: "28. After a sentence or order made as aforesaid, a person interested, who was not a party to the proceeding, may, within five years, proceed by bill in equity to impeach or establish the will, on which bill, if required by either party, a trial by a jury shall be ordered, to ascertain whether any, and if any how much, of what was so offered for probate, be the will of

the decedent. If no such bill be filed within that time, the sentence or order shall be forever binding." This section is materially different in some respects from section 34 of chapter 123 of the Code of 1860 of Virginia upon the same subject as to mode of trial when a bill is filed impeaching a will, as will be seen by a comparison of the two sections. See also opinion of Judge Baldwin in *Malone's adm'r et al.* v. *Hobbs et al.* 1 Rob. 387, 388, 389.

In the 1st vol. of Redfield on Wills 2d ed. pages 176, 177, 178 it is said: "As questions of a very embarrassing nature often arise in regard to the proper testamentary character of papers left in the form of a will but expressed in terms more or less contingent, it must be borne in mind, that in that class of instruments the question must turn upon the point, whether the contingency is referred to, as the *occasion of making* the will, or as the *condition* upon which the instrument is to be *become operative.* Ordinarily, when the instrument is executed with all the requisite formalities, it will be presumed to have been done *animo testandi*, notwithstanding that it may be expressed to have been made to avoid the contingency of dying intestate, in case the testator should not return from a contemplated journey. In such a case, in order to render the instrument contingent in its operations, it should clearly appear by its language, that it was not intended to remain as an operative will except in the failure to return." This seems to be in accordance mainly with principles stated by Judge Moncure in his opinion in the case of *Cody* v. *Conly*, 27 Gratt. 313:

In the case at bar we understand from the decree of the 12th day of December, 1876, and exhibits in the cause, that it was proven before said court with the consent of parties by parol evidence, that the paper-writing in question here was wholly in the handwriting of the deceased, and that the signature thereto was the genuine signature of the decedent, and that the decedent was at the time he executed said instrument of sound mind.

In addition to this the plaintiff took the deposition of the defendant, and she in her examination in chief and in answer to questions propounded by plaintiff's counsel, testifies in substance, that she is the widow of W. T. French; that she was present when he executed said paper-writing; that on the day he wrote it the river was very deep, and he (the decedent) was starting to go across the river, and she was very anxious for him not to go; that she was afraid some accident would happen; that she tried to persuade him not to go; he started out of the room and then came back and sat down and wrote said paper-writing, or in the language of the witness "wrote that will;" that she is not certain whether Miss Lizzie Pugh was in the room when he wrote the will, but, if not, she came in, and he (the decedent) handed her the said paper-writing and told her to read it, and he (decedent) then handed it to her (witness) and told her to take care of it; that she thought he was in earnest; that she don't recollect of his laughing at all; that if she had not thought him in earnest, she would not have presented the said paper-writing; that she don't recollect that he said to her that she need not be afraid of the consequences, if he did get drowned that morning, as she would be all right, or anything to that effect; that she was in the habit of keeping her husband's papers; that he generally gave them to her to take care of; that she put said paper-writing in a box with some receipts, and about one week before her husband's death he told her to look up a receipt for him, and in looking for the receipt she came across said paper-writing, and took it and put it in another place in her top drawer, in a box in her room with some other important papers that she had, and for that reason she had difficulty in finding it when she was looking for it, because she had forgotten where she had put it; that she could not tell where to look the first time, because her cousin was looking, and she (witness) could not direct her where to look for it, her (witness) mind was so confused at the time on

account of her trouble; that this occurred after the death of her husband; that after this she went to Baltimore and spent a month, and while there thought over the matter, and then recollected where she had put it, and that when she returned from Baltimore she went to the place and found it herself.

I infer from this evidence of Mrs. French, that she and her husband resided on or near a river, and that on the day said paper-writing was executed by the decedent said river was more full and deeper than common, and that she considered that it was dangerous for her husband to attempt to cross it in its then condition. It also appears that the decedent and his wife never had any children; and from the face of the will it appears that the decedent owned real and personal estate, although it nowhere appears in the cause what amount of real and personal estate he owned, or what was the probable value thereof. It is also a fact that if on the day of the date of said paper-writing the decedent had died, his wife would, by the statute of descents and distributions then in force in this State, have inherited the whole of decedent's real estate, and been entitled to receive the whole of his personal estate after payment of his debts, &c.

Thus we have the making and execution of said paper-writing by the decedent with his own hand fully proved, and the circumstances which surrounded him when he made it. It is also shown that at the time he made and executed said paper-writing he deposited it with his wife to *take care of*, and that according to his directions she did take care of it until her husband's death. It is not established by the evidence in my judgment that said paper-writing was written with a pencil, as plaintiff's counsel seems to infer, and I do not think at this day it should be consided material whether the will was written with pen or pencil. I am unable to see why a will written with pencil may not as well be held valid as a note or bond so written.

It is to be presumed that the decedent and his wife

knew at the time said paper-writing was executed, that if the decedent died on that day intestate, his wife was his sole legal heir and distributee of his real and personal estate. What then was the purpose and object of the testator in executing said paper-writing? Had he in so doing the *animo testandi*? Did he simply execute it to quiet the fears of his wife? How could that quiet her fears? If it was his property that disturbed and distressed her in case of the death of her husband in crossing the river that morning, then the execution of the will could not tend in the least to quiet her fears, for in case of his death on that day she would have been entitled by law to all his property. If it was danger and peril to the life of her husband in attempting to cross the river on that morning in the then condition of the river, the execution of said paper-writing could have given her no relief in mind or feeling, for it was no security against the danger and peril of her husband. But it is insisted by the counsel, that the will was made jestingly, that the decedent was only jesting with his wife in making said paper-writing, and that he did not in fact intend it as or to be a testament.

What is there in the case tending to show that the paper-writing was executed in jest and was not intended to be a testament? Certainly, considering that he was at the time of sound mind, which is not questioned in this case, his acts and verbal declarations at the time, do not indicate that it was made jestingly, and that he did not intend said writing to be his testament. On the contrary they tend most strongly to prove, that the decedent did intend said writing as and for a testament. But it is argued that said writing did not give his wife anything more than she would have been entitled to by law, if the decedent had died on that day, and the said paper-writing is *conditional and contingent in law,* and became void and inoperative at 12 o'clock noon of the day of its date, because the contingency upon which said paper-writing was to operate as a will, to-wit: the death of the dece-

62

dent by drowning, did not occur before 12 o'clock noon of that day ; and that if said contingency had happened on that morning, said paper-writing did not profess to give the decedent's wife, any more or less of his property on the happening of said contingency than the law would have given her, but just the same ; and that such being the fact, said paper-writing would have been void as a testament as to the real estate, at least, and of no value in any respect ; and that the presumption is, from the state of the law at the time and from the contents of the paper-writing, that said paper-writing was executed in jest, and was not intended as or to be a testament.

It is necessary and proper here to proceed to enquire and determine, whether said paper-writing must be considered in law as *conditional* and *contingent,* or otherwise. To determine this question, it is necessary and proper to recur to authorities and decisions upon the subject of conditional and contingent wills.

In the case of *Parsons* v. *Lanoe,* 1 Ves. Sr. 190, decided in 1748, the language of the paper-writing was : "If I die before my return from my journey to *Ireland.*" In this case it was held by the Lord Chancellor, Hardwicke, that the paper-writing was a provisional contingency and no part thereof was intended to take effect but in the event of his dying before his return ; and having returned, the whole disposition was ineffectual. In the same case the Lord Chancellor held, that when there is an alteration of circumstances by having children after making a will, as seems to have been the case in that case, no strained construction should be made to make the will effectual. See same case reported in 2 Ambler R. 557. The form of the will of the decedent in this case as given in 2 Ambler R. 557, is : "I, Charles Delanoe, of ——————, do make and appoint this to be my last will and testament, in manner following: *i. e. Imprimis,* in case I should die before I return from the journey I intend, God willing, shortly to undertake for *Ireland,* my will and desire is," &c. The testator was

then married, but had no children. He afterwards re-
turned from Ireland, and had some children. *Ingram* v.
*Strong*, 2 Phillim. 294, decision made after 1813.

The syllabus to the case of *James Jacks et ux.* v. *George Henderson*, 1 Desaus. Eq. 543, is : " A native of Scotland enjoying some estate there, being about to come to Carolina to take possession of an estate there, executed a paper which has some characteristics of a deed and some of a will, which was recorded in Scotland by his proctor. This paper had reference to his intended voyage and the accidents it exposed him to, as the inducements to its execution, in order to prevent disputes in case of his death. He arrived in Carolina, lived a number of years, married a lady of some fortune, and died without leaving issue. The court was of opinion, that even if the paper was to be considered as a will, the dispositions of it were merely provisional and contingent ; and the contingency (to-wit : his death before he arrived in Carolina) not having happened, the dispositions of the estate cannot take effect, at least not to the prejudice of the wife and her rights." This case was decided in 1797.

In the case of *Sinclair* v. *Hone*, 6 Ves. 607. "A codicil expressed, in 'case of the testator's death before he joins his wife', was executed after a separation in the West Indies upon his voyage for England. That voyage being prevented by accident he joined her ; they lived together there and in England having returned together ; and the testator having afterwards gone to Corsica and thence to Lisbon died there. The codicil was held to be contingent, and did not take effect under the circumstances."

In the case of *Wagner* v. *McDonald*, 2 Harr. & J. 346. "A paper was exhibited for record as the will of C. W. proved to have been signed by him at a time when he was about to leave the State. It was written in the form of a letter, and stated : 'If I should not come to you again, my son M. shall pay,' &c. Evidence was given that C. W. went to Kentucky and returned, and that he

lived for several weeks thereafter. Held, that the paper could not be admitted to record as the last will of C. W." This decision was made in 1808.

In the case of *Todd's Will*, 2 Watts & S. 145, it was held, that "an instrument, limited by a condition as to its operation, cannot be admitted to probate as a will after a failure of the contingency, on the happening of which it was to have taken effect. One, in contemplation of a journey, thus begins an informal testamentary paper. 'My wish, desire and intention now is, that if I should not return (which I will no preventing providence) what I own shall be divided as follows.' Held, that upon his return and subsequent death the instrument ought not to be admitted to probate." This decision is based upon the said cases of *Parsons* v. *Lanoe* and *Sinclair* v. *Hone.*

In the case of *Maxwell, &c.* v. *Maxwell*, 3 Metc. (Ken.) 101, it was held, that "a will or codicil may be entirely depending on a contingency, so as to have no effect as an instrument of a will unless that event happened (1 Ves. Sr. 199). In January, 1857, M. of Nelson county Kentucky escaped from the wreck of a steamer on the Mississippi river, and arriving in Memphis, Tennessee, wrote his wife a letter, in which, after an account of the hardships and dangers through which he had just passed, he says: 'The ice is still running very bad in the river. I can't say when I will be able to get off from here, but I suppose soon, as the weather seems to be moderating. The river is very low and navigation very dangerous, so much so, I feel that I should protect you in any emergency. I would not have had you with me for the world. If I never get back home, I leave you everything I have in the world. The property I got by my first wife, I wish you to return everything to her father.' The letter and signature were wholly in his handwriting. It was received by his wife. He subsequently returned home and lived until March, 1858, when he was murdered near his residence by his slaves. *Held:* That the in-

strument was a contingent will, and as the condition, upon which it was to take effect, did not happen, it cannot be established as a last will and testament."

In the case of *Dougherty &c.* v. *Dougherty &c.*, 4 Metc. (Ky.) 25, the will was as follows: "As I intend starting in a few days to the State of Missouri, and should any thing happen that I should not return alive, my wish is, that all of my land," &c. (going on to devise an estate). The author of the paper made the contemplated trip, returned to Kentucky and died. *Held*, that the instrument is contingent and inoperative as a will." Decided in 1862.

In the case of *Louis L. McGee et al.* v. *George McNeil et ux.*, 41 Miss. 17. "P., a soldier in the Confederate army, made his last will and testament to this effect: 'If I never return home I want all I have to be my wife's.' The will was made whilst he was absent from home in the army. P. returned home and in a few weeks afterwards died. *Held*: That the will was to take effect upon the contingency that the testator never returned home, and that event having happened, the will had no effect and was void."

In the case of *W. H. Robnett et al. defendants in error* v. *Mary C. Ashlock plaintiff in error*, 49 Mo. 171. "The opening clause of a will was as follows: 'I this day start for Kentucky ; I may never get back. If it should be my misfortune, I give my property' &c. *Held:* That the visit to Kentucky was not named merely as the occasion of the making of the will as from its supposed risks reminding of the necessity or propriety of the act, but that his death prior to his return from Kentucky was the condition, on which the will depended for its efficacy, and in case of his return it became void."

Redfield in his work on Wills, 2d ed. pp. 170, 171, says: "When the payee of a promisory note made a special endorsement to the effect, that if he were not living at the time of its payment, he ordered the contents paid to a person named, and died before the note was paid, the endorsement was held to be of a testamentary

1878
Special Term.

French
v.
French.

character, and entitled to probate as a will. But papers of a similar character depending upon contingency, which had not clearly transpired, have been denied the testamentary character." Judge Redfield in his work on Wills, 1 vol., 2d ed., 430, 431, in speaking of the permanent rules of construction says: "And there is none of more universal application, both here and in England, than that the plain and unambiguous words of the will must prevail, and are not to be controlled or qualified by any conjectured .constructions, growing out of the situation, circumstances, or condition, either of the testator, his property, or family." The same author, at page 430, note 11, says: "It is said in *Currie* v. *Murphy*, 35 Mo. 473, that it is always safest to adhere to the words of the instrument without looking to extrinsic circumstances, or the amount of the property, or the consequences of a particular construction. But such facts are always admissible in aid of construction of wills, to the extent of explaining doubts or removing uncertainties. *Goodhue* v. *Clark*, 37 N. H. 525; *Travis* v. *Morrison*, 28 Ala. 494; *Succession of Theosame*, 12 Ann. (La.) 384; *Lowe* v. *Ld Huntingtower*, 4 Russ. 532, n; *Noel* v. *Noel*, 12 Price 213; *Edens* v. *Williams*, 3 Murph. 27."

Mr. Jarman's 16th rule as cited by Redfield p. 426, 427 is: "XVI. That words, in general are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another can be collected, and that other can be ascertained; and they are in all cases to receive a consideration, which will give to every expression some effect, rather than one that will render any of the expressions inoperative; and of two modes of construction that is to be preferred, which will prevent a total intestacy." Redfield in same book 432, 433, says: "All the books which treat of the construction of wills constantly repeat the formula, that the intention of the testator is the prevailing consideration in applying all rules of construction." And in his first rule on same page he says: "1. The first and universal qualification of

this rule is, that it is the intention of the testator, expressed in his will, which is to govern; and this must be judged of exclusively by the words of the instrument as applied to the subject matter, and the surrounding circumstances." *Wootten* v. *Redd's ex'r,* 12 Gratt. 196; *Waller* v. *Waller,* 1 Gratt. 454. In rule 3, p. 433, 435, he says, that "In seeking for the expressed intention of the testator his words are to receive that construction and interpretation, which a long series of decisions has attached to them, unless it is very certain they were used in a different sense." See also 1 Redfield pages 421, 422. "The court will give some meaning to the instrument, if any can fairly be gathered from its words, with every allowable aid to construction." Redfield's 7th rule p. 433, 435.

In the casè of *Pond et al,* v. *Bergh et al.,* 10 Paige 140, Chancellor Walworth in delivering the opinion of the court at page 152 says: "The intention of the testator, so far as it is consistent with the rules of law, must govern in the construction of a will; when therefore the intention is apparent upon the whole will taken together, the court must give such a construction as to support the intent of the testator, even against strict grammatical rules. And to effectuate his evident intention, words and limitations may be transferred, supplied or rejected. *Marshall* v. *Hopkins,* 15 East 309; *Spark* v. *Purnell,* Hob. Rep. 75; *Montagu* v. *Nucella,* 1 Russ. 165; *Doe* v. *Micklem,* 6 East 486; *Fonereau* v. *Fonereau,* 3 Atk. 315; *Doe* v. *Hicks,* 7 T. R. 437; *Boon* v. *Cornforth,* 2 Ves. Sen. 279; *Doe* v. *Stenlake,* 12 East 515."

In *Burton* v. *Collingwood,* 4 Hag. 176, "A will containing this passage 'Lest I die before the next sun, I make this my last will' was admitted to probate, the court holding the disposition not contingent; and adherance to it being shown by careful preservation." 1 Williams on Executors, 5th American edition 162.

I have before cited the case of *Cody* v. *Conly,* 27 Gratt. 313.

There is another case referred to by Judge Wood in his opinion in *Maxwell* v. *Maxwell*, 3 Metcalf 101, at page 105 where the language of the will was "In case I should die on my travels" &c. It was held the will was not contingent. In *The Goods of Dobson*, First Probate and Divorce 88 decided in 1866, it was held, that a will commencing with these words: "In case of any fatal accident happening to me, being about to travel by railway, I hereby leave" &c., held 'not to be contingent upon the event of the testator's death on the journey he was about to take when the will was executed. In this case Judge Wilde said "I am unwilling to refuse probate of a testamentary paper on the ground that it was contingent, unless it is clear that the testator intended that it should operate only in a certain event, or during a certain period." He says in the case of *The Goods of Winn*, 2 Sev. & Tr. 147 and *Parsons* v. *Lanoe*, the court saw, that the testator had expressly limited the operation of the will to a certain time, and accordingly refused probate. But he says in this case the testator's mind seems to have been this: "My mind is drawn to the consideration that all railway travel ing is attended with danger, and therefore I think I had better make my will."

In *The Goods of Martin*, decided in 1867, 1 Court of Probate and Divorce 380. "A will in these words: 'I. W. M. being physically weak in health, have obtained permission to cease from all duty for a few days, and I wish during such time to be removed from the brig Apellenia, to the floating hospital ship Berwick Walls, in order to recruit my health; and in the event of my death occurring during such time, I do hereby will and bequeath,' &c. *Held*, not to be contingent on the event of the testator's death in the illness from which he was suffering when the will was made." Sir J. P. Wilde said in this case "I am of opinion that this will is not conditional. I am satisfied, that the testator, when he executed, did not intend that it should be conditional." In *The Goods of John Porter*, decided November term 1869,

2 Court of Probate and Divorce 21, "the deceased exe-

cuted a paper, in which he made use of the following
language: 'Being obliged to leave England to join my
regiment in China, I leave this paper containing my
wishes. Should anything unfortunately happen to me
whilst abroad, I wish everything that I may be in posses-
sion of *at that time*, or anything appertaining to me
hereafter, to be divided,' &c. The deceased returned to
England from China. *Held:* That the dispositions of
the will were dependent upon the death of the deceased
in China, and that therefore the will itself was condi-
tional."

Lord Penzance said in this case : " I am obliged very
reluctantly to refuse this application ; but it is open to the
parties to propound the will if they think proper. The
court is bound to hold that this will is conditional.
Looking at the cases already decided, and the principles
therein laid down as to contingent wills, I find a distinc-
tion drawn. It is the common feature of wills, in respect
of which this sort of question arises, that the testator
therein refers to a possible impending calamity in con-
nection with his will ; and the question arises, whether
he intends to limit the operation of the will to the time
during which such calamity is imminent. If the lan-
guage used by him can by reasonable interpretation be
construed to mean that he refers to the calamity and the
period of time during which it may happen as the reason
for making a will, then the will is not conditional ; but
if he refers to the calamity or the possible occurrence of
some event as a reason for a certain disposition of his
property, and mixes up the disposition of the property
with the event so that one is dependent on the other,
then the court must hold the will to be conditional. I
must now determine within which class this will falls.
In *Roberts* v. *Roberts*, 2 Sw. & Tr. 337, the disposition of
the property was only to take effect on the happening of
an event which did not happen, and the will was held by
C. Criswell to be conditional. In *Thorne's Case*, 4 Sw.

& Tr., the will was in these terms : ' I request that
in the event of my death while serving in this horrid
climate, or any accident happening to me, I leave and
bequeath,' &c.    That case is the strongest in favor of
the present application.    The fact was that although the
testator did not die on the Gold Coast, his health was
destroyed during his service there, and he was sent home
an invalid in time to die; and the court thought it was
not necessary to limit the operation of the will to the
event of death on the Gold Coast."    He then refers to
the case of *Dobson*, 1 P. & D., to which I have be-
fore referred, and says in relation thereto : " The event,
the danger of railway traveling, is given as a reason for
making a will."

He then refers to *Martin's Case*, 1 P. & D., to which
reference has been made by me, and he says of it : "Here
again an event, the probability of death, is given as a
reason for making a will."    He then proceeds: " The
question then is, whether the paper before me comes
within the principles of these cases.    I think it does not.
If it had stopped at the end of the first sentence, I think
it would have come within it.    'Being obliged to leave
England to join my regiment——should anything unfor-
tunately happen to me whilst abroad ; ' but the testator
goes on to say : ' I wish everything that I may be in
possession of *at that time* to be divided,' &c.    At what
time ?    His death whilst abroad." &c.

In the case of *Strauss* v. *Schmidt*, 3 Phillim. 209, decided
in 1820, according to the syllabus of the case it was held
by Judge Nicholl, that "a recognition establishes testa-
mentary papers which were conditional ;" but from what
I see of the case the recognition seems to have been by
letter or letters in the handwriting of the deceased.

In the case of *Skipwith et al.* v. *Cabell's ex'r et al.*,
*Lee et al.* v. *Cabell's ex'r et al.*, 19 Gratt. 758, it was held :
"1st. Mrs. C., an old and very wealthy lady, after dispos-
ing by her will and two codicils of a large amount of her
property, at the close of the second codicil says : 'In

case of sudden and unexpected death, I give the remainder of my property to be equally divided between my cousin Dr. C. of Philadelphia and my cousin P. S. of New Orleans, one-half of which each must hold in trust for the benefit of their children,' this is not a conditional legacy dependent upon the sudden and unexpected death of the testatrix. 2. In such cases the question is, whether the contingency is referred to as the reason or occasion for making the disposition, or as the condition upon which the disposition is to become operative."

It seems that it is now an established principle, that while a person may make a conditional will, his intention to do so must appear clearly. Judge Moncure in the case of *Cody* v. *Conly et al.*, in his opinion in that case (and his opinion seems to have been that of the whole court) says at pp. 320, 321 : "The cases on this subject show, that while a person *may* certainly make a conditional will, his intention to do so must appear very clearly on the face of the will; and if such an intention do not so appear, the will must be regarded as unconditional. Indeed in some of the cases the form of expression was conditional, and yet the construction of the will was otherwise." See also 1 Redfield on Wills 2d ed. 177, 178, also in *The Goods of Dobson*, Law Reports Courts of Probate and Divorce 88. In *Lister* v. *Smith*, 10 Jur. N. S. 107 (1874), 1 Redfield on Wills 2d edition, note 22, page 171, 172, 173. Sir J. P. Wilde said : "on the other hand, if the fact is plainly and conclusively made out, that the paper, which appears to be the record of a testamentary act, was in reality the offspring of jest, or the result of a contrivance to effect some collateral object, and never seriously intended as a disposition of property, it is not reasonable that the court should turn it into an effective instrument. And such is no doubt the law. There must be the *animus testandi*."

In the case of *Butler* v. *Butler et al.* 3 Barb. Ch. 304, it was held, that in the construction of wills if the language of the testator is such that it may be

construed in two different senses, one of which would render the disposition made of his property illegal and void, and the other would render it valid, the court should give that construction to his language which will make the disposition of his property effectual." *Griffin* v. *Ford,* 1 Bosw. 123.

What was the motive or purpose of the decedent in executing the paper-writing in question in the case at bar, regarding him as a man of sound mind, and considering the evidence in chief of Mrs. French, taken by plaintiff, and the surrounding circumstances and the facts, of which the decedent is presumed to have known, to which I have before referred? Can we conclude that the decedent jestingly executed said paper-writing, and handed it to his wife with directions to take care of it? To do so would be to so determine without sufficient evidence of the fact, in my humble judgment. The acts and verbal declarations of the deceased at the time, do not indicate anything like jest; and the circumstances, which evidently led to its execution, or were the reason therefor, were not such as would be likely to cause a sane man to indulge in a mere jest of that description with his wife distressed for his safety, which could not in fact have been considered by her short of a gross insult, as well as a source of great mortification, for she is presumed to have known the law of descents and distribution as well as the decedent. Mrs. French swears that she thought her husband was in earnest, and to attribute to him the opposite, under the circumstances, would be unnatural.

Can we consistently and properly construe said paper to be conditional and contingent, that is to say, from the language employed in the said paper-writing and the surrounding circumstances and the facts which the decedent must have known, that it was the intention of the decedent to do a silly, absurd and useless act, an act without meaning, that he had no reasonable purpose in view, for if it is conceded that the decedent's purpose in

1878
Special Term.

French
v.
French.

executing said paper was that it should not take effect unless he died or was drowned on the morning of its execution, then there is no escaping the conclusion that the decedent in executing said paper-writing and delivering it to his wife to take care of knowingly, in legal presumption, did a silly, absurd, useless and meaningless act, without any purpose or motive whatever, such an act as a person in possession of his reasonable senses would not be likely to do.

If we ascertain his intent in executing said paper-writing to have been to make an unconditional testament giving his property to his wife, who he indicated to be the chief object of his bounty, at his death, then we determine that the decedent in making said paper-writing did a reasonable act, such an act as a reasonable man might well and consistently do.

I apprehend that it cannot reasonably be maintained, that the deceased meant that the disposition of his property or the validity of the will should depend upon the manner of his death, to-wit: by drowning. Suppose the deceased had been killed that morning by lightning, or had been shot dead while in the act of crossing the river on that morning, could it be successfully maintained that the will was void, and · that the testator intended it should be void in case of his death on that morning in any manner other than by drowning? I humbly think not. Such a construction would be too narrow and contracted, and would in fact be preposterous in my humble judgment. The testator was on that morning about to undertake a perilous and dangerous passage across a deep river, and death to him by drowning was then naturally most prominent in his mind, and thus he doubtless used the words get drowned, by which he indirectly meant "die" or death in any form. I have found no case just like this, though some of the cases cited, where the will was held to be absolute, have some resemblance to it. But suppose that at 11 o'clock that morning the decedent had crossed the river safely,

1878
Special Term.
─────────
French
v.
French.

but on returning home in crossing the river at one o'clock in the afternoon, he had drowned in the river, was it his intention by his will that the will should be void and inoperative in that event, and for that reason? Under the circumstances of this case I feel constrained to answer in the negative.

In the light of some of the more recent English authorities and Virginia cases which I have cited, and the rules of construction applicable to such a case, I am of opinion, under the facts and surrounding circumstances, to which I have alluded, we may well and properly conclude in this particular case with its peculiar characteristics, that said paper-writing was not intended by the decedent to be provisional and contingent, but was intended by him to be absolute; that the language used by the decedent in the said paper-writing can in this particular case, with its peculiar surroundings, be reasonably interpreted and construed to mean, that he refers to the calamity, and the time during which it may happen, as the reason for making said paper-writing, and not as the condition upon which the disposition of the property is to become operative; and that the will should be interpreted as though it read: " Lest I get drowned this morning; or lest I die this morning." It is no valid objection to carrying out the obvious intention of the testator, if it be not illegal or against good morals, that it is strange, or unnatural or absurd. But such a construction will, if possible, be adopted, as will uphold the will, and bring it as near reason and good sense as practicable. Rule 6, 1 Redf. on Wills, 2 ed., 433, 435. The same author at pp. 435, 436, same book, says: " It is said in one case, 'It is our duty to give effect to all the the words, without rejecting or controlling any of them, if it can be done by a reasonable construction;' and also 'the construction of a will depends upon the intention of the testator, to be ascertained from a full view of every thing contained in the four corners of the instrument. And the natural construction of the words will be

adopted, unless there is such an impracticability of so construing them as to authorize their rejection ; or such uncertainty that no effect can be given to them in that sense.' "

1878
Special Term.

French
v.
French.

After patient and careful consideration of the whole case I am convinced in my own mind, that the decedent seriously executed said paper-writing, and that it was his purpose and intent in so doing to make a testament; that he executed it *animo testandi*, and that it was the intent and purpose of the decedent that said paper-writing should be his unconditional will and testament, giving to his wife, Florence, all of his real and personal estate at his death, whether natural or otherwise ; and the Court, in order to give effect to the intention of the decedent, will presume that said paper-writing was executed in contemplation of any change of the law of descents as to legal heirship which might be and was made between the date of the said will and the death of the decedent. And I have arrived at these conclusions after excluding from consideration in the cause the evidence of Mrs. French, given in her own behalf on cross-examination, and also the deposition of Rebecca Swisher and the deposition of H. W. Stump as to oral declarations of the decedent made to each of them, though perhaps the declarations made to Miss Swisher may be considered as bearing alone upon the *animo testandi* ; but I do not decide that question, as I deem it unnecessary and immaterial under the views I have expressed. Under a different state of facts and surrounding circumstances in some material aspects I might have felt myself bound, under the legal authorities, to have come to a different conclusion. But I cannot avoid the convictions of my mind in this novel and peculiar case as I have before stated them. As we have seen, I have considered the evidence in chief of Mrs. French taken by the plaintiff. She does not appear to have testified under protest or objection. She did not except to the taking or reading of her deposition in the court below for any cause ; and in fact it

Syllabus 7.

does not appear that any objection was made in the court below to her evidence in chief being read and considered by any person. Nor has any objection been made thereto before us. Under these circumstances I do not feel that the character of her evidence taken by the plaintiff is such as to require this court of its own motion to exclude it from consideration for reasons of public policy.

For the foregoing reasons the decree of the said circuit court of the county of Hampshire, rendered in this cause on the 12th day of December, 1876, must be affirmed.

Syllabus 5. But the circuit court in its said decree declares: "The court being of opinion from all the evidence in the cause," &c., which the plaintiff's counsel argues necessarily includes the evidence of Mrs. French the defendant, given in her own behalf on her cross-examination by her counsel as to the conversation or communication had by her personally with the deceased a short time after he wrote the will, as deposed in her deposition on cross-examination; and the counsel for the plaintiff insist here, that it was error in the court to hear the cause upon the said testimony given in her own behalf on cross-examination as to said communication had by her personally with the deceased, under the 2d paragraph of the 23d section of chapter 130 of the Code of this State of 1868. This evidence does not seem to be in explanation of her evidence given in chief on behalf of the plaintiff and at his instance, or any part thereof, but seems to be new matter entirely. It seems to me, that under the 2d paragraph of said 2d section of chapter 130 of the Code, the witness, Mrs. French, was incompetent to testify as to said communications had by her personally with the deceased. *Lee* v. *Dill et al.*, 39 Barb. 516; *Hatch* v. *Peugnet*, 64 Barb. 189. If her evidence on cross-examination had been in explanation of facts testified to by her drawn from her by the plaintiff in his examination of her in chief in his behalf, I am not now prepared to say how far she might, by way of expla-

nation of such facts, in her cross-examination go into transactions or communications had by her personally with the deceased; and it is not necessary to give an opinion on that question, as it does not arise in this case; but see the subject somewhat discussed in *Sanford by &c.* v. *Sanford,* 5 Lans. (N. Y.) 486, 494, 495. The matter of her evidence may be objectionable in some aspects; but of that under another head.

Although the said evidence of Mrs. French, given in her own behalf, seems to have been excepted to at the time it was taken in general terms, the question of her competency to testify in her own behalf on her cross-examination as to said communication, does not appear to have been brought to the attention of the court below, or passed upon by the court below, still the witness being incompetent to testify in her own behalf to said communications, it is not too late to make the objection in this court, especially as the ground of incompetency is one that could not have been removed by the defendant, if the objection had been brought to the attention of the court below, and that court had sustained the objection. There may be some exceptions to the general rule laid down upon the subject of exceptions to the deposition of a witness for incompetency; but that question does not arise here.

According to the New York authorities, as far as I have seen them, it was competent for Mrs. French to testify in her own behalf, under the second paragraph of said section 23 of chapter 130 of the Code, to the conversation had by Miss Rebecca Swisher personally with the deceased, which she heard, if said conversation was relevant and proper evidence in the cause. *Simmons et al.* v. *Sisson et al.,* 26 N. Y. 264; *Lobdell et al.* v. *Lobdell et al.* 36 N. Y. 327, 333 and 334; *Sanford, by, &c.* v. *Sanford,* 5 Lans. (N. Y.) 486; *Hilderbrant* v. *Crawford, Crawford a survivor, &c.* v. *Hilderbrant,* 6 Lansing 502; *Marsh* v. *Gilbert,* 2 Redf. (N. Y., Surrogate) 465; *Brague* v. *Lord et al., ex'rs* 67 N. Y. 495. But under

the view I have taken of this case it is unnecessary to decide that question in this case ; and I do not decide that question now.

It appears from the decree rendered in this cause, to which I have referred, that the court was of opinion that the said paper writing "was not conditional or contingent in its effect or operation, but was an absolute testa-mentary disposition of his estate, as such was recognized and referred to by the said testator after the date mentioned therein, doth accordingly adjudge" &c.   It would seem from this that the court below gave some weight and consideration in its determination of the cause to the fact, that the testator recognized and referred to said paper-writing as his will ; and this the counsel for the plaintiff insists was error.

Syllabus 6.   If I am to understand that the court was of opinion, that if the said paper-writing was clearly provisional and contingent, and the contingency contemplated by the will did not happen within the time specified in the will, that the recognition of the will by the testator after the failure of the contingency by verbal declarations revived or continued the will as an absolute valid will, then that court was in error, as I understand the authorities upon that subject.   In the case of *Parsons* v. *Lanoe*, 2 Ambler 557, Lord Hardwicke said at page 559 : "As I am of opinion, none of the collateral proofs as to his taking notice of the will &c. can be taken into consideration, unless some act was done by him to republish or to defeat the condition that was annexed to it before , and it ought not to be supported by parol proof against the statute of frauds, either in law or equity." *Maxwell &c.* v. *Maxwell*, 3 Metc. (Ky.) 101 ; *Dougherty &c.* v. *Dougherty, &c.*, 4 Metc. (Ky.) 25 ; *Robnett et al.* v. *Ashlock*, 49 Mo. 171, 172 ; *McGee et al.* v. *George McNeil et ux.*, 41 Miss. 17, 25 ; Redfield on Wills 2d ed. pp. 177, 178, 179 and notes including note 45 ; *Wootten* v. *Redd's*

Syllabus 4.   *ex'r et al.*, 12 Gratt. 196.   Parol declarations of the testator cannot be admitted to control the construction of a

will, except when the terms used in the will apply indifferently without ambiguity to each of several different subjects or persons, when evidence may be received as to which of the subjects or persons so described was intended by the testator. *Wootten* v. *Redd's ex'r et al.*, 12 Gratt. 196; *Boylan et al.* v. *Meeker et al.*, 122 Gratt. 274; *Stevens et ux.* v. *Vancleve*, 4 Wash. C. C. 262; *Skipwith et al.* v. *Cabell's ex'r et al.*, 19 Gratt. 758.

But I have already ascertained and determined that the substantial parts of the said decree rendered in this cause are correct, excluding and without considering the evidence of Mrs. French given on her own behalf on her cross-examination, and also the deposition of Rebecca Swisher and H. W. Stump as to the verbal declarations of the decedent made to each of them; and the plaintiff is not injured by any errors of the circuit court in hearing the cause thereon and giving effect in its determination of the cause, in whole or in part, in any respect whatever, as the substantial parts of said decree are sustained and authorized from what otherwise appears in the cause, after rejecting the cross-examination of Mrs. French and the depositions of Miss Swisher and H. W. Stump as to the verbal declarations of the decedent W. T. French.

The said decree must therefore be affirmed with costs and $30.00 damages to the appellee.

JUDGES JOHNSON AND MOORE CONCURRED.

GREEN, PRESIDENT, dissented.

The question whether the paper signed and written by William T. French, dated March 7, 1872, was a conditional will must be determined by the words of the will itself, construed by the light of the circumstances surrounding the testator when he wrote. The paper is in these words:

"Let all men know hereby, if I get drowned this

morning, March 7, 1872, that I bequeath all my property, personal and real, to my beloved wife Florence. "Witness my hand and seal, 7th March, 1872.

"WILLIAM T. FRENCH."

The only circumstances surrounding the testator when he wrote this will, which can throw any light on its meaning, are these: That he then had a wife, Florence, the defendant, and no children; that if he had died without making a will on the morning of March 7, 1872, when the will was made, she, as his sole heir and distributee, would have got all his property, personal and real; that he was, when he wrote this paper, about to cross a river which was deep, and he might in crossing it be drowned.

There were no other circumstances surrounding the writing of this paper, which can possibly throw any light on the meaning of this paper. The decisions, which have been cited by my brother Haymond, show clearly that a person may make a conditional will. This is not controverted by a single case. But in order to make a conditional will, the intention of the testator to do so must appear very clearly on the face of the will. Now on the face of this will the purposes of the testator to make the bequest of all his property, real and personal, to his wife conditional upon his being drowned that morning, is as clear and distinct as it is possible to make it by the use of the English language.

There are, it is true, cases which have gone even further and held, that where the language of the testator used in his will is such that according to their usual signification it would make the will conditional, still the court, if they can find in any part of the will, or in the surrounding circumstances under which it was written, anything which will enable the court to interpret the will as merely indicating the motive which induced the testator to make this will at the time it was made, they will so interpret the will, and hold it not to be conditional.

Beyond this the courts have never gone; and in fact it

is impossible to conceive how they could go further than this, without holding that they could convert a conditional will into an unconditional one without being able to find in the will itself, or in the surrounding circumstances, any reason for doing such violence to the expressed purposes of the testator; in other words, without holding that the courts may, if they deem a conditional will unreasonable, set it aside and make a new and unconditional will for the testator, though no indication can be found in the will itself, or in the surrounding circumstances under which it was made, by which the testator's words can be interpreted as doing otherwise than making his will conditional.

None of the cases cited by my brother Haymond, and none which I have been able to find, go farther than to hold that a will, conditional on its face, may be interpreted to be unconditional, when the court can find in other parts of the will, or in the surrounding circumstances under which it was made, reason to believe that the testator, though he used language which would, in ordinary signification, make his will conditional, nevertheless only meant to assign the motive which induced the testator to make this particular will at the particular time it was made.

All the cases do not go this far. But let us admit that to be the law; and let us then apply it to the case before us. The language of the will on its face makes it clearly a conditional will. But according to the law as laid down in the case most favorable to the views of the appellee, if we can find in any portion of this will, or in any of the surrounding circumstances under which it was written, any reason to believe that the testator meant by the words "if I get drowned this morning, March 7, 1872, I bequeath all my property to my wife," simply to indicate, that the motive he had in making this will on the morning of March 7, 1872, whereby he gave all his property to his wife, was his apprehension that he might be drowned that morning, I admit there are deci-

sions, which if followed, would enable us if this was all the testator meant, to hold the will unconditional. But if we can find in the will itself, and in the surrounding circumstances under which it was written, no reason to believe that by the words "if I get drowned this morning, March 7, 1872, I bequeath all my property to my wife," the testator could possibly have meant to express his motive for making that particular will at that particular time, then no decision has been referred to by my brother Haymond, and I have found none, which would justify us in violating the clear language of the testator by declaring this will unconditional.

In so doing we would make the emphatic words "if I get drowned this morning, March 7, 1872," to mean nothing. If this language cannot be construed to indicate the testator's motive for making this will, they must be construed to make the will conditional, or they must be regarded as if they were not in the will; and this last alternative has never been adopted by any court in any case, and cannot be without setting aside the testator's clearly expressed will, and making another will for him.

It remains then to enquire whether by the words "if I get drowned this morning, March 7, 1872, I bequeath all my property, personal and real, to my wife," the testator could possibly have meant "as I may get drowned this morning, I therefore now make my will and give all my property, real and personal, to my wife."

I think it is self-evident that this could not possibly be what was meant by the testator in using the words "if I get drowned this morning," because in the circumstances, which actually surrounded the testator, the fact, that he might get drowned that morning, could not possibly be any reason why he should then make a will, simply giving all his property to his wife. For the testator knew, if he got drowned that morning, that by the law his wife would get all his property, real and personal. This apprehension then that he might be drowned

this morning, could not by any possibility be the reason why he then made this will. And yet to make this will unconditional we must construe the plain words "if I get drowned this morning, I give all my property to my wife," to mean an indication by the testator, that his apprehension of getting drowned that morning was the motive for making this will. This we have seen could not possibly be his motive in then making that will. And yet we are required in order to come to the conclusion that this is unconditional, not simply to pervert the plain and unambiguous language of the testator, but to make him assign as a reason for then making this will, a reason which could not possibly have operated upon him.

If the will had made any other disposition of the testator's property other than precisely that which the law then made, or had even merely named an executor, I can see clearly, that the apprehension that he might be drowned that morning might have been a good reason for making such a will. For his object then might have well been to make a different disposition from what he knew the law would do, if he was drowned that morning; or in case he made no different disposition of his property, but simply appointed an executor, this would have furnished him a motive for making a will then, as if he were drowned that morning the only way in which he could name the person, who was to be his representative after his death, was by making his will. But he could have had no possible motive in making the will he did to avoid the consequences of his being drowned that morning; for it would have avoided none of these consequences.

We are therefore compelled to construe this will as a conditional will. And there is no possible way of avoiding this conclusion except by striking out from the will these emphatic words, "if I get drowned this morning March 7, 1872," words, which it was obvious were inserted by the testator for a purpose, and which constitute a third of the testator's whole will. It is said however

that if these words were permitted to remain in the will, it would necessarily render it idle and nugatory. That is perfectly true. And that they render the will necessarily idle and nugatory furnishes a strong reason why we should if possible give them some other than their literal meaning. But we have seen it is impossible to give to these words any other than their plain literal meaning; for if we did, we would make the testator do a thing quite as absurd as making an idle and nugatory will, that is, we would make him assign as a reason for his then making the will, which he made, a reason which could not possibly have operated upon him, but which must necessarily have had exactly the opposite effect; a reason which must have then prevented him from making this will. If then we cannot without being guilty of a palpable absurdity change the meaning of these words: "If I get drowned this morning," can we simply disregard them, because they render the will idle or nugatory? Can we strike out important words in a will, which can possibly bear but one construction, and the clear meaning of which the surrounding circumstances show the testator well knew, in order to prevent the will from being idle or absurd, and when by so doing we make a will for the testator entirely different from anything, which we can gather from the will itself, he intended? It seems to me this would be exceeding the powers of any court. It would be clearly not interpreting the will, but making a will for the testator. It would not be even professing to interpret the will, as it proposes to strike out of it words admitted to have but one clear meaning, and that too, a most important meaning. The fact that these words make the paper necessarily idle, can in this case only raise a suspicion, that it was not intended by the writer as his will, that it was not really testamentary; but intended by the testator at the time he wrote it to have no effect at all; a suspicion strengthened by its being written in pencil, which may be inferred from the defendant's proving he was in the habit of

writing with a pencil. No one was present when this will
was written except the testator's wife and a lady, who is
the wife now of the plaintiff in this suit, and who of
course cannot testify under what circumstances this paper
was written, or what was then said by the testator to
indicate whether the writer of this paper wrote it as a
will or as a jest.   The testator's widow, the defendant in
this suit, was obviously equally incompetent to testify, if
she had been objected to as a witness.   But she was ex-
amined by the plaintiff; and it may be this makes her
statements evidence, though I am by no means prepared
to say, that the wife or widow may give in evidence the
confidential statements of the husband, even when she
is introduced as a witness by consent of all parties.   It
seems to me that perhaps the public policy may, after a
husband is dead, forbid his widow to so testify in any such
case.   The confidential intercourse between husband and
wife may be seriously embarrassed, if the wife under any
circumstances can testify as to such confidential commu-
nications after his death.

The testimony about what the testator afterwards said
about this paper was of course not proper evidence to be
considered in this case. Excluding this improper testi-
mony, and it is in my mind very questionable whether
the writer of this paper ever intended it to be regarded
as his will.   But in the view I take of the case this en-
quiry is unimportant.   If this paper had been in writ-
ing, and formally signed in the presence of attesting
witnessess as the will of the testator, it would not have
altered this case materially.   It would then have been
unquestionably the will of William T. French, when he
made it, but in my judgment it would have clearly been
a conditional will; and as the condition, on which it was
to take effect as a will, never arose, it can of course have
no operation as a will.

DECREE AFFIRMED.